UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

PROGRESSIVE PLUMBING, INC.,

Chapter 11
Case No.: 6-15-bk-

Debtor.
_____/

# CHAPTER 11 CASE MANAGEMENT SUMMARY

Debtor, Progressive Plumbing, Inc., by and through its undersigned attorney, and pursuant to Local Rule 2081-1 of the United States Bankruptcy Court for the Middle District of Florida, hereby files its Summary of the Case and states as follows:

1. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2. The Debtor is operating its business and managing its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Description of the Debtor's Business

3. Debtor is a commercial plumbing contractor in Clermont who has been in business since 1985. Until very recently, Debtor had never failed to complete a job. Debtor's role is generally as a subcontractor on large commercial construction projects, ranging from hotels, condominiums, and other multi-story structures.

4. Jobs which the Debtor has worked on include Marriott Ocean Watch Villas, Rosen Resort Hotel at Shingle Creek, the Omni at Champions Gate, the Renaissance Hotel, and many other well-known buildings.

5. Debtor currently has multiple ongoing jobs in locations across the country.

Location of Debtor's Operations and Whether Leased or Owned

6. The Debtor's operations are managed from its headquarters located at 1064 W. Hwy. 50, Clermont, Florida, 34711 (the "Headquarters"), which building and property it owns and shares 50% with joint tenant and affiliate Debtor Gracious Living Design Center, Inc. ("GLD"). Debtor currently has the Headquarters listed for sale and hopes to use proceeds of the sale to pay creditors and help Debtor reorganize.

7. Most of the Debtor's plumbing operations take place at its "fab shop" located at 14435 Division Street, Groveland, Florida, 34736 (the "Shop"), which building and property is solely owns.

Reasons for Filing Chapter 11 and Strategic Objectives

8. For almost 30 years, Debtor was a very successful and profitable commercial plumbing contractor which had few financial difficulties. Debtor had and has a reputation as one of, if not the, best commercial plumbing contractor in Central Florida. Debtor generally operated in Florida where it had longstanding relationships with many of the general contractors with whom it did business. During the "Great Recession," however, Debtor was unable to procure sufficient jobs in Florida and began bidding for and winning jobs out of state and consequently began working with many more unknown general contractors.

9. In 2013, Debtor also entered into a General Indemnity Agreement (the "GIA") with a new surety, Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company ("Darwin").

10. Debtor began to experience collection issues with general contractors on out-of-state jobs. The contracting industry is notorious for the "chiseling" that contractors do to their subcontractors, particularly with regards to retainage, but the financial pressures of the general

economy and the lack of a personal relationship caused many of the Debtor's general contractors to begin making false claims about the Debtor's work in order to exert leverage and refuse to make payments.

11. Debtor could have survived this increase in collection challenges, but one general contractor in particular, Evergreen Construction, became so hostile to Debtor and began assessing so many additional back charges and change orders on one particular, large job, known as the Hyatt Atlanta, that Debtor was put in a precarious position where it would stand to lose approximately $100,000.00 if it continued on the job. Debtor wanted to continue work and complete the job even at a loss, having until that time never failed to complete a job. Debtor's surety Darwin, however, counseled Debtor that Debtor should leave the job and let Darwin step in, hire a replacement contractor, and finish the project. Debtor protested, but Darwin promised Debtor that it would mitigate the damages, that a new plumbing subcontractor would have a better relationship with the general contractor, and that Darwin would ensure that all losses would be minimized. Relying on Darwin's promises, Debtor handed the job over to Darwin. This was, in hindsight, an enormous and costly mistake for the Debtor. Darwin immediately accused Debtor of "abandoning" the job. Darwin hired and paid a new subcontractor who proceeded to bill for everything Debtor had already done, as well as overbilled for the work necessary to complete the job, it having no incentive to do otherwise as Darwin had written it a blank check knowing that it would charge everything back to Debtor. Costs spiraled out of control, and an expected loss of $100,000.00 ballooned into a claimed loss of over $750,000.00.

12. Darwin demanded immediate payment of over $750,000.00 as an indemnity under the GIA. Debtor simply did not have the liquidity to comply with this request and further disputed the amount due. After long and seemingly productive negotiations, Darwin and Debtor reached a

settlement whereby, on July 8, 2015, Debtor executed a promissory note in the amount of $752,107.33 in favor of Darwin (the "Note"). The Note provided for monthly payments on a ten year amortization with a five year term. To secure the Note, Darwin demanded collateral, and Debtor and its affiliates and principals executed a Mortgage and Security Agreement (as amended, the "Darwin Mortgage"). The Darwin Mortgage purportedly granted a second mortgage to Darwin in the Headquarters and the Shop, along with property owned by Debtor's principals personally. The Darwin Mortgage (as amended) was recorded on July 27, 2015.

13. Barely one week after recording the Darwin Mortgage, Darwin called a default under the terms of the Note based on spurious allegations that Debtor had applied approximately $36,000.00 in receivables and used the funds to pay vendors and sub-subcontractors without first notifying Darwin. Darwin then demanded the immediate execution of deeds to all of the real property collateral and the immediate turnover to Darwin of all funds from all of Debtor's jobs. To make matters much worse, on August 6, 2015, Darwin sent letters to all of Debtor's general contractors on jobs which were bonded by Darwin, instructing and demanding that they forward all amounts due to Debtor to Darwin instead (the "Letters"). Darwin even sent such a letter to a general contractor for a job not bonded by Darwin, clearly a tort of intentional interference with contract.

14. The Letters were devastating to Debtor's business as its general contractors have stopped paying anyone. Darwin has refused to retract the Letters. This has frozen Debtor out from receiving nearly all of its receivables and Debtor cannot collect meaningful revenue until the Letters are retracted.

15. From the facts, it appears that Darwin set the Debtor up, procuring collateral then immediately calling a default once it felt more secure. This appears to be a bad faith attempt to

improve its position and to induce Debtor to provide collateral. These grants of collateral are obvious preferential transfers and chapter 11 can be used to avoid them.

16.     Since the recent uptick in the economy, Debtor no longer needs to go out of state to get sufficient jobs and the profit margins have gone significantly up. Overall, the Debtor's assets appear to outweigh its liabilities by approximately $1,000,000.00. Chapter 11 will allow the Debtor some breathing space, force Darwin to retract the Letters so it can bring in revenue, and allow Debtor to challenge Darwin's claimed damages amount and restructure its remaining obligations to Darwin, if any, over time.

17.     Debtor has and has had a good business for over 30 years. Debtor has a great team put together and a fantastic reputation. It has collected all the necessary tools of the trade and expertise. It has simply run into a single nightmare creditor. The cause of this chapter 11 is not systemic issues, but simply the pressures that have been placed on Debtor because of the Hyatt Atlanta job and Darwin's refusal to work with the Debtor in good faith. The Debtor believes it can propose a plan with minimal impact on its creditors other than Darwin and only impacting Darwin to the extent Darwin's claimed damages need to be reduced or offset. The Debtor's substantial going concern value needs to be preserved, and chapter 11 is the only place it can do that. Without chapter 11, Debtor's assets will be sold at a firesale and some creditors may go unpaid.

<u>Officers, Directors, and Salaries</u>

18.     The Debtor has four members of its board of directors, who are also the Debtor's officers.

  a.     William "Bill" E. Lawson is the President and founder of Debtor. He earns a salary of $6,240.00 per month.

  b. William "Billy" E. Lawson II is the Executive Vice President of Debtor. He earns a salary of $9,009.30 per month.

  c. Charlene Lawson is the Secretary of Debtor. She earns a salary of $4,160.00 per month.

  d. Kimberly J. Lawson-Sapp f/k/a Kimberly J. French is the Treasurer of Debtor. She earns a salary of $9,009.30 per month.

### Debtor's Annual Gross Revenues

19. The annual gross revenues of Debtor are estimated to be $8,400,000.

### Amounts Owed to Various Secured and Unsecured Creditors

20. Subject to defenses and offsets, the following creditors may assert secured claims:

  a. First Green Bank ("FGB") is owed money based on a mortgage in the approximate amount of $1,012,000.00 and a line of credit in the approximate amount of $494,000.00. FGB is secured by a first lien on most all assets, including Debtor's real estate. FGB has been cooperative with the Debtor and Debtor intends to continue the relationship on its current terms or on other terms agreed to by FGB.

  b. The Internal Revenue Service (the "IRS") is owed money based on a federal tax lien in the approximate amount of $560,000.00 for payroll obligations. The IRS is secured by a second lien on the Debtor's real estate and a lien of undetermined priority on Debtor's other assets. The IRS has been extremely cooperative with Debtor and has a working and workable payment plan with Debtor in place.

  c. Darwin may be owed money based on a General Indemnity Agreement in the approximate amount of $750,000.00. Darwin, however, has only

a limited interest in its purported collateral as its security interest only reaches to property related to and generated by jobs on which Darwin is the surety, not all of Debtor's assets. Furthermore, Darwin's security interest in personalty was not properly perfected until August 6, 2015 (if it even was then), when it corrected an incorrect and misleading financing statement, and therefore Darwin's perfection is a preference and its security interest can and will be avoided under the Debtor's strong arm powers. Additionally, Darwin's mortgage was only recorded last month, and will also be a preference. Therefore, Darwin's interest in much of its collateral, if any, is temporary.

        d.     Minor secured creditors also include Marlin Business Bank, John Deere, Inc., and Canon Financial Services who have relatively small debts secured by purchase money security interests in equipment.

21. Subject to defenses and offsets, Debtor has unsecured claims of approximately $500,000.00 and $1,000,000.00. These numbers are difficult to determine at this time because many of Debtor's unsecured obligations to its vendors and sub-subcontractors are also owed by the respective general contractors who often independently pay Debtor's creditors and Debtor only finds out at a later time. There is also significant insider unsecured debt in the total amount of approximately $570,000.

### Status of Debtor's Payroll and Sales Tax Obligations

22. Debtor has 39 employees, exclusive of its officers. These employees range from workman to foreman to bookkeepers and other management positions. As of the Petition Date, the Debtor owes its employees (including officers) approximately $36,000.

23. On account of Debtor's issues with the Hyatt Atlanta project, Debtor fell behind on

its payroll tax obligations. Debtor has reached a working and workable agreement with the IRS, as described above, to repay those obligations over time.

General Description and Approximate Value of Debtor's Assets

24. The Debtor's Headquarters is worth approximately $1,600,000.00 pursuant to a recent appraisal. The Debtor's Shop is worth approximately $400,000.00. The Debtor also owns a condominium in Tallahassee worth approximately $100,000.00. Total real property value is approximately $2,100,000.00.

25. The Debtor currently has accounts receivable in the amount of $1,500,000.00.

26. The Debtor has approximately $600,000.00 of other tangible personal property.

27. The Debtor's current and fixed assets appear to exceed $4,000,000.00.

Anticipated Emergency Relief

28. Debtor anticipates seeking the following emergency relief:

    a. Motion to Use Cash Collateral

    b. Motion to Pay Prepetition Wages of Employees

    c. Motion to Pay Insider Affiliate Salaries

    d. Motion to Maintain Prepetition Bank Accounts

    e. Motion to Pay Critical Vendors

    f. Utility Motion

    g. Motion for Joint Administration of Affiliate Cases

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail and/or CM/ECF to all creditors listed on the attached mailing matrix this 24th day of August, 2015.

/s/ Michael A. Nardella
Michael A. Nardella, Esq.
Florida Bar No. 051265
Nardella & Nardella, PLLC
250 East Colonial Drive, Suite 102
Orlando, FL 32801
(407) 966-2680
mnardella@nardellalaw.com

Proposed Counsel for Debtors

and

/s/ Roman V. Hammes
Roman V. Hammes, Esq.
Florida Bar No. 087250
Roman V. Hammes, P.L.
250 East Colonial Drive, Suite 305
Orlando, FL 32801
(407) 650-0003
roman@romanvhammes.com

Proposed Counsel for Debtors