UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

PROGRESSIVE PLUMBING, INC.,

PROGRESSIVE SERVICES, LLC, and
GRACIOUS LIVING DESIGN
CENTER, INC.

    Debtors.
_____/

Chapter 11
Case No.: 6:15-bk-07275-KSJ

Jointly Administered with
Case No.: 6:15-bk-07276-KSJ
Case No.: 6:15-bk-07277-KSJ

**BRIEF IN SUPPORT OF DEBTOR'S EMERGENCY MOTION TO COMPEL
COMPLIANCE WITH THE AUTOMATIC STAY AND REQUEST
FOR EMERGENCY PRELIMINARY HEARING (DOC. 22)**

Debtor, Progressive Plumbing, Inc., by and through its proposed undersigned counsel, and pursuant to this Court's request at the hearing on August 27, 2015, hereby submits its Brief in Support of Debtor's Emergency Motion to Compel Compliance with the Automatic Stay (Doc. 22), and in support states as follows:

Factual Background

1.    On August 24, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.    Debtor is a plumbing contractor in Clermont who has been in business since 1985.

3.    On March 20, 2013, Allied World Specialty Insurance Company f/k/a Allied National Assurance Company ("Allied")[1] and Debtor entered into a General Indemnity Agreement (the "GIA") whereby Allied agreed to stand as surety for certain jobs performed by Debtor. A

---

[1] While "Darwin" is the name on the contracts and is still a trade name of the company, counsel at the hearing noted his preference for "Allied." Hence the change in usage from Debtor's prior filings.

1

copy of the GIA is attached as **Exhibit 1**.

4. On account of jobs out of state, Debtor began to suffer financial problems, particularly with regards to a project in Atlanta known as the "Hyatt Atlanta." On account of these financial troubles, Debtor and Allied agreed on the provision of financial assistance on certain of the jobs bonded by Allied.

5. The financial assistance provided by Allied mostly took the form of payments to certain of Debtor's materialmen and laborers.

6. Allied did not take over as "completing surety" on any of Debtor's jobs except the Hyatt Atlanta, which Allied convinced Debtor to allow Allied to take over with promises that everything would be fine, and which decision Debtor now greatly regrets.

7. Debtor was never placed in default under its other jobs, but did receive some financial assistance from Allied on certain jobs.

8. On account of the financial assistance provided or estimated to be provided by Allied on the Hyatt Atlanta job, among others, Allied sent to Debtor a letter dated March 23, 2015 demanding the immediate provision of $750,000 by Debtor as collateral. A copy of the letter is attached as **Exhibit 2**.

9. The $750,000 number stemmed from the actual _and_ _estimated_ amounts paid by Allied. Attached as **Exhibit 3** is a chart showing how much was paid and for which jobs.

10. Debtor did not have $750,000 in liquidity to comply with this request and further disputed the amount. After long and seemingly productive negotiations, Allied and Debtor reached a settlement whereby, on July 8, 2015, Debtor, _et al_, executed a promissory note in the amount of $752,107.33 in favor of Allied (the "Note"). A copy of the Note is attached as **Exhibit 4**.

11. The Note is expressly governed by Florida law and provides for monthly payments

on a ten year amortization with a five year balloon, with interest only for 6 months. Payments were to begin on September 1, 2015.

12.     The Note includes to-the-penny calculations of the amounts due monthly and upon the balloon.

13.     To secure the Note, Allied demanded collateral, and Debtor and its affiliates and principals executed an Amended Mortgage and Security Agreement and that certain Mortgage and Security Agreement (collectively, the "Allied Mortgage"). The Allied Mortgage granted a mortgage to Allied on Debtor's headquarters, along with property owned by a non-debtor entity. The Allied Mortgage was recorded on July 9, 2015, and July 27, 2015.[2]

14.     Debtor delivered the original Note to Allied and Debtor paid all documentary stamp taxes, intangible taxes, and recording fees.

15.     The intent of the Note and the Allied Mortgage was simple. If Allied demanded immediate repayment of the $750,000 and began to exercise its legal rights and remedies against Debtor, Debtor would go out of business, Allied would be forced to complete Debtor's jobs, and Allied would be assured of recovering only a portion of its outlays.

16.     Instead of this mutually assured loss, Allied and the Debtor reached a compromise. Debtor would agree to the amount of the debt proposed by Allied and to pay the debt with interest, and Debtor and its affiliates would pledge additional and valuable collateral.[3] In exchange, Allied would agree to accept payment over time and forbear from exercising its legal remedies with

---

[2] The amended Allied Mortgage was recorded after Debtor learned that the IRS had recorded a lien prior to Allied recording the original Allied Mortgage. Debtor was told by Allied that it would be preparing more mortgages to cover additional properties in light of the IRS lien but Allied never provided the mortgages for execution.

[3] As admitted by Allied in its Objection to Use of Cash Collateral (Doc. 24) at ¶ 9, Allied has actually paid out $691,597.23. The remainder was expected losses.

regards to the amounts owed it and rolled into the Note. Allied would allow Debtor some breathing space to continue to collect its receivables, operate in the ordinary course, and get back on its financial feet. Allied made representations that Debtor would be entitled to collect its receivables owed on Allied bonded jobs.

17. This was consistent with past practice. Allied had never required segregated accounts for funds from Allied bonded jobs, nor had Allied ever previously complained when Debtor used leftover receivables from Allied bonded jobs to pay overhead.

18. Debtor relied on this agreement and on Allied's representations when it executed the Note and gave additional collateral. Debtor would never have entered into this compromise if it knew that Allied would claim simultaneous entitlement to all of Debtor's receivables, as the loss of its receivables would (and will) cause Debtor to go out of business. In such a case, the compromise would be of no benefit to Debtor and would, by virtue of the giving of additional collateral, in fact make everything much worse for Debtor and its affiliates.

19. In other words, if Allied were to receive the Note and the additional collateral from the Allied Mortgage, all while retaining its remedy to take all of Debtor's receivables, Debtor would never have entered into the deal and would have simply let Allied shut it down. Shutting down, however, would be risky for Allied as that would mean Allied would be responsible for finishing Debtor's jobs.

20. Barely one week after recording the Allied Mortgage, Debtor informed Allied that it had used a portion of an approximately $30,000.00 receivable to pay Debtor's overhead after paying labor and materialmen. For reasons Debtor still does not understand, but about when most of Debtor's jobs bonded by Allied were complete or nearly complete, Allied began launching accusations against Debtor.

21. On August 6, 2015, Allied sent a letter to Debtor demanding the payment of an additional $750,000 in collateral by August 11, 2015, for potential, future exposure that Allied "believes" may occur, and if such amounts were not paid, Allied stated it would "seek a judgment." A copy of this letter is attached as **Exhibit 5**.

22. Although the GIA requires five business days' notice for demands for collateral (August 13, 2015), Allied did not even wait until August 11, 2015, the letter's stated deadline, to begin its collection activities against Debtor's receivables.

23. Instead, on August 6, 2015, Allied sent letters to certain of Debtor's general contractors on jobs which were bonded by Allied, instructing and demanding that they forward all amounts due to Debtor to Allied instead (the "Bonded Job Letters"). Copies of certain of the Bonded Job Letters issued by Allied are attached as **Composite Exhibit 6**.

24. In addition, Allied also sent a letter on August 8, 2015, to a general contractor named KAST Construction Company, LLC ("KAST"), demanding that KAST make all payments due to Debtor on its contract with Debtor to Allied instead, even though the job Debtor has with KAST is not bonded by Allied (the "KAST Letter," and collectively with the Bonded Job Letters, the "Letters"). The KAST Letter was particularly egregious because Allied has no even remote connection with the KAST job. A copy of the KAST Letter is attached as **Exhibit 7**.

25. When these Letters were sent out by Allied, Debtor was not in default under either the GIA or the Note (first payment under the Note was not due until September 1, 2015).

26. Both pre-petition and post-petition, Debtor asked Allied to retract the Letters. On September 2, 2015, to its credit, Allied retracted the KAST Letter, but has continued to refuse to retract the Bonded Job Letters. A copy of the retraction of the KAST Letter is attached as **Exhibit 8**.

27. In spite of expressly agreeing to accept payments over time via the Note, Allied is now asserting that it has the unfettered right to collect upon all of Debtor's receivables on Allied bonded jobs (the "Receivables") in order to repay Allied for the financial accommodations previously made, but amounts that indisputably were previously rolled into the Note. Allied is now claiming that the Receivables are (a) trust funds for which Allied is the beneficiary, and/or (b) Allied's funds pursuant to the remedy of equitable subrogation.

28. Debtor disagrees with both contentions, but Debtor does admit that Allied currently has a security interest in the Receivables.

29. The Court at the hearing scheduled for September 9, 2015, will have to make two major determinations: (a) is Allied currently permitted to exercise its remedy of equitable subrogation to claim ownership of the Receivables in order to achieve repayment of the financial accommodations previously made by Allied and rolled into the Note without first seeking relief from stay, and (b) are the Receivables trust funds, and if so, is Allied the beneficiary and therefore entitled to continue to seek payment of the funds without first seeking relief from stay.

Memorandum of Law

A. *Equitable Subrogation Is an Equitable Remedy and Is Not Available to a Surety Unless the Principal Is in Default*

Equitable subrogation "is a remedy commonly associated with surety relationships." *Cont'l Cas. Co. v. Ryan Inc. E.*, 974 So. 2d 368, 377 (Fla. 2008).[4] "Equitable subrogation has been defined as 'the substitution of one party for another whose debt the party pays, entitling the paying

---

[4] As equitable subrogation is a creature of equity and a remedy, "[w]hen applying equitable subrogation, bankruptcy courts look to the law of the forum state." *In Matter of CUA Autofinder, LLC*, 387 B.R. 906, 912 (Bankr. M.D. Ga. 2008).

6

party to rights, remedies, or securities that would otherwise belong to the debtor.'" *Id.* at 376 (citing *Black's Law Dictionary*). "Basically, it is an equitable **remedy** created by the legal consequences of the acts and relationships of the parties." *Ryan Inc.*, 974 So 2d at 377 (internal quotations omitted) (emphasis added). Equitable subrogation provides that "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Id.* (internal citations omitted).

As a remedy, equitable subrogation is not available to a surety when its principal is not in default. *Waterhouse v. McDevitt & St. Co.*, 387 So. 2d 470, 472 (Fla. 5th DCA 1980) ("No equitable subrogation was involved because the principal was not in default.").

The interplay of bankruptcy law and equitable subrogation was most clearly discussed in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37 (1962), a pre-Code case where the Court held that when a surety took over a job from a defaulting contractor and made payments to complete that job, the retainage owed at the completion of the job belonged, pursuant to the remedy of equitable subrogation, to the surety, not to a bankruptcy trustee. *Pearlman* is still good law, and if a surety is in fact entitled to exercise its rights of equitable subrogation, then even if the funds are technically a part of a bankruptcy estate, pursuant to the remedy of equitable subrogation, the surety would step into the shoes of the owner/general contractor and be entitled to set off any amounts paid by that surety.

This remedy, however, is limited on a job-by-job calculation, as a surety can only take the retainage from a job up to the amount the surety paid *on that job*. *Transamerica Ins. Co. v. Barnett Bank of Marion County, N.A.*, 540 So. 2d 113, 117 (Fla. 1989) ("Priority based on equitable subrogation in one contract does not provide priority in excess funds from another contract.").

While it is true that Allied made payments on certain of Debtor's jobs, Debtor is not

7

currently in default under either the GIA or the Note. Even assuming *arguendo* that Allied has retained rights of equitable subrogation after accepting the Note, without an actionable *default* there can be no *remedy* of equitable subrogation.

> B. *Allied Bargained Away Its Right to the Remedy of Equitable Subrogation and/or Its Rights As Beneficiary of any Trust Funds in Exchange for the Note and Allied Mortgage*

Equitable subrogation is a right that accrues to a surety under an agreement of indemnity. If a surety's rights and remedies under an indemnity agreement are novated in exchange for a new document with new rights and remedies, or are otherwise postponed by the existence of a new contract with new terms, a surety cannot exercise its remedy of equitable subrogation or enforce rights as beneficiary under such an agreement.

"A novation is a mutual agreement between the parties for the discharge of a valid existing obligation by the substitution of a new valid obligation." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1237 (11th Cir. 2008). "Under Florida law, four elements are required to effectuate the novation of a binding contract: (1) a previously valid contract; (2) agreement of the parties to cancel that contract; (3) a new valid and binding contract; (4) agreement of the parties that the new contract will replace and extinguish the old one." *Id.* "Intent may be inferred from the totality of the circumstances surrounding the transaction." *Id.* "The question of intent 'is generally a question of fact' for a jury." *Id.*

In *United States v. Nill*, 518 F.2d 793, 798 (5th Cir. 1975), the Fifth Circuit had to determine whether the acceptance of a note related to a contract debt acted as a novation. The Fifth Circuit noted some confusion in Florida law:

> Florida law with regard to the acceptance of a promissory note in satisfaction of an antecedent debt is nebulous. On the one hand, Florida courts have held that novation, which extinguishes the old debt, **may be implied from the facts and circumstances attending the transaction** and the parties' subsequent conduct. On the other

>hand, these same courts have stated that Florida law requires an express agreement that the giving of a promissory note or negotiable instrument shall operate as payment before it can have that effect. . . . . ultimately the question whether there has been an express agreement that a promissory note is to be considered as payment for an antecedent debt is one of fact for the jury.

(internal citations omitted) (emphasis added).

The *Nill* court continued, citing to and approving an old "landmark case" by the Florida Supreme Court, *Frank v. Williams*, 18 So. 351, 356 (Fla. 1895), and quoted approvingly the following reasoning:

>It is true, as a general rule, that the mere acceptance by a creditor from his debtor of a promissory note for a preexisting simple contract debt does not, in the absence of an agreement to that effect, extinguish the original demand. In such case **no recovery can be had on the original cause of action unless the note is produced to be canceled**, or, in case of its loss, the establishment of such fact.

(internal citations omitted) (emphasis added). This is further confirmed by reviewing the remaining portions of *Frank* following the quote above:

>But while the taking of a note for a pre-existing simple contract debt does not, in the absence of a special agreement to that effect, extinguish the original debt, it will operate to extend the time of the payment of the debt until the maturity of the note. It was said in *The Kimball*, 3 Wall. 45, that 'by the general commercial law, as well of England as of the United States, a promissory note does not discharge the debt for which it is given, unless such be the express agreement of the parties. It only operates to extend until its maturity the period for the payment of the debt. The creditor may return the note when dishonored, and proceed upon the original debt. The acceptance of the note is considered as accompanied with the condition of its payment.'
>\*\*\*\*
>The acceptance and holding of the note payable at a future day for a simple contract debt due is a sufficient consideration for a postponement of the debt until the note falls due. **The legal effect of such an arrangement is to postpone the original debt**, unless there is an express agreement to the contrary.

(emphasis added). Later in *Frank*, the Florida Supreme Court states that the acceptance of the new

9

note "suspend[s]" the right of action on the original contract.

*Nill* and *Frank* therefore hold that whether a note is a novation is a question of intent. More importantly, they hold that even if a note is not a novation, no "recovery can be had on the original cause of action" without the new note first being dishonored and then "produced and cancelled." *See also Manufacturers & Traders Trust Co. v. First Nat. Bank in Fort Lauderdale*, 113 So. 2d 869, 871 (Fla. 2d DCA 1959) (discussing a "forbearance in fact" when note and mortgage given in exchange for antecedent debt and stating that "the effect of the acceptance of renewal notes is to postpone the original date and extend the time of payment until the maturity of the note.").

Allied accepted the Note and Allied Mortgage. It was always the Debtor's understanding that the Note and Allied Mortgage would replace the obligation of immediate payment under the GIA for the amounts Allied paid on Debtor's jobs. This was a compromise born of necessity, as without this compromise, Debtor would have shut down. Debtor would never have given the Note and Allied Mortgage, with all that new collateral, if it would then not be allowed to collect the Receivables. The Note includes specific, precise amounts for each monthly payment, and includes a specific balloon. It has very definite payment terms, an interest rate, and provides for interest only payments for the first six months to give Debtor some breathing room.

Allied's Letters, however, are designed to collect on amounts that were once due and owing to Allied, but which amounts *are not currently due and owing* as they have been rolled into the Note. Before Allied accepted the Note, Allied likely had access to the remedy of equitable subrogation as to the Receivables. If it had exercised that remedy prior to accepting the Note, Debtor would have shut down operations, ongoing jobs would have been compromised, and Allied would have incurred far more losses and recovered far less than the full amount it was or would

be owed. Instead, Allied asked for and got the Note, and it got additional collateral.

The Note and the Allied Mortgage are either a novation, or a forbearance in fact. If a novation, Allied's rights under the GIA, either to equitable subrogation or to a trust, have been replaced. If not a novation, "no recovery can be had" on the amounts owed by Debtor to Allied under the GIA unless the Note is first dishonored and then "produced and cancelled." The Note has not been dishonored. Nor has the Note been produced and cancelled by Allied. Therefore, as to the amounts paid by Allied on certain of Debtor's jobs, Allied has bargained away its remedy of equitable subrogation and/or its rights to a trust and subordinated those rights to its new rights under the Note and Allied Mortgage.

> C. *Allied Waived Any Rights It May Have Retained to Equitable Subrogation or Allied Is Equitably Estopped from Seeking the Remedy*

"The right to subrogation can be modified or extinguished by contract or may be waived either expressly or by implication." *CUA Autofinder, LLC*, 387 B.R. at 913 (applying Georgia law). "Waiver of the right of subrogation is a question of intention." *Id.* (citing 83 C.J.S. Subrogation § 21 (2008)).

Equitable subrogation is a creature of equity and is also subject to other equitable defenses, like estoppel. Under Florida law, "the elements of equitable estoppel are: (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon." *In re Summit View, LLC*, 2011 WL 3268367, at *5-6 (M.D. Fla. 2011) *aff'd,* 472 Fed. Appx. 900 (11th Cir. 2012).

Prior to sending the demand letter on August 6, 2015, Allied had never required segregation of funds on Allied bonded jobs, was not disallowing usage of the receivables on those jobs to pay Debtor's overhead, and had made representations in front of Debtor to third parties that Debtor

11

was the party owed receivables on Allied's bonded jobs. Allied always knew that Debtor needed the Receivables to operate, and would collapse without them, and Allied knew this when it accepted the Note and Allied Mortgage. Debtor relied on this conduct and these representations. Debtor materially changed its position based on this conduct and these representations by giving additional collateral, and having its affiliates do as well. Debtor also executed the Note and agreed to pay interest, etc.

The facts suggest that Allied intentionally and voluntarily waived its remedy of equitable subrogation by accepting the Note and Mortgage and by its conduct and representations. To the extent such was not the actual intent of Allied, Allied is estopped from now seeking to enforce the remedy of equitable subrogation due to its prior representations and conduct.

   D. *Equitable Subrogation Is an Equitable Remedy and Subject to General Principles of Fairness and Justice*

Equitable subrogation "has for its purpose the working out of an equitable adjustment and the doing of complete and perfect justice between the parties by securing the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it, and preventing the sweeping away of the fund from which in good conscience the creditor ought to be paid." *Compania Anonima Venezolana De Navegacion v. A. J. Perez Exp. Co.*, 303 F.2d 692, 697 (5th Cir. 1962). "It is not an absolute right, but one which depends upon the equities and attending facts and circumstances of each case." *Id.*

"Moreover, the equity of the party seeking subrogation must be strong and his rights clear, and his equity must be superior to that of other claimants." *Id.* "Subrogation 'is not an absolute right which a party paying the debt of another may enforce at will, but rather, a matter of grace to be granted or withheld as the equities of the case may demand.'" *Id.* (citing 50 Am. Jur. Subrogation 3 at 679). "The whole aim of subrogation 'is the doing of equity and justice, and the

12

relief will not be decreed where it will work an injustice, and so it cannot be invoked to the injury of innocent third persons.'" *Id.*

The facts and circumstances attending this case show that it would not be just or fair for Allied to retain the benefits of the Note and Allied Mortgages while simultaneously taking from Debtor all the benefits it hoped to receive in exchange for giving the Note and Allied Mortgages. While Debtor has no direct evidence of this, it appears that Allied always intended to shut Debtor down, but that it waited to do so for two reasons: First, Allied waited until it had secured additional collateral from the Debtors and non-debtors. Second, Allied waited for most of its bonded jobs to be essentially complete so that, when it put Debtor out of business, it would have little exposure left related to completing any unfinished jobs. Barely a week after recording the Allied Mortgage, and without even giving Debtor five business days to cure its trumped-up second demand for collateral based on potential future losses, Allied pulled the rug out from under Debtor by sending the Letters.

The Letters have had their intended effect, and much of Debtor's revenue is frozen. The circumstantial evidence shows that Allied kept Debtor alive just long enough to improve its position. Allied cannot then invoke equity and utilize a remedy that is completely inconsistent with its acceptance of the Note and Allied Mortgage.

E. *The Receivables Are Not Trust Funds Under New York Law*

Allied relies on certain language in the GIA to establish that the Receivables are trust funds to which Debtor owns bare legal title only. Paragraph 3.8 of the GIA contains some very broad language whereby Debtor and Allied appear to agree that Debtor will hold all funds received on Allied bonded jobs in trust for Allied and/or Debtor's laborers and materialmen for any "Loss" sustained by Allied. In Allied's Objection to Use of Cash Collateral (Doc. 24), Allied cites to

13

cases in Florida and other jurisdictions where courts have held that such clauses create enforceable trusts, although the context of those cases is generally concerning 11 U.S.C. § 523(a)(4) and alleged defalcation.

What Allied misses, however, is that the GIA in ¶ 7.8 expressly states that it is governed by New York law.  To create a trust, New York law requires actual delivery of the *res* with the intention of vesting legal title in the trustee.  Regarding an indemnity agreement with similar trust *res* language to the language in the GIA, the court in *In re Suprema Specialties, Inc.*, 370 B.R. 517, 530-31 (S.D.N.Y. 2007) stated as follows:

> There was no actual delivery of the *res* with the intent of vesting legal title in the trustee.  The indemnity agreement sought by its terms to extend the "trust fund" label to payments that had not yet been made, received, or became due.  But funds that have not been actually delivered to the trustee cannot form part of the trust *res*. . . . Here, the indemnity agreement failed to [appropriately describe the funds that were to make up the trust] as its terms did not limit the creation of the trust to those funds that had actually been delivered to the trustee.  Such overreaching on the part of the sureties violates New York trust law and precludes a finding that an express trust had been created.

The court further found that "[d]uring the entire period that the Bond was in effect, the Sureties never made a demand that Suprema [the debtor] establish a trust account. . . . The Sureties are unable to prevail on a trust fund theory because Suprema took no action to distinguish those payments that were supposed to be subject to the alleged trust from Suprema's other cash receipts." *Id.* at 531.  Without a requirement of segregation, there can be no express trust under New York law.

In addition, to form an express trust from an indemnity agreement, there still needs to be evidence of the intent of the settlor of the trust, *i.e.*, the transferor of the trust *res*.  Without the settlor's intent to create a trust, there is no trust.  *See Elyachar v. Gerel Corp.*, 583 F.Supp. 907,

922 (S.D.N.Y. 1984) ("[A] trust is created only if the settlor properly manifests an intention to create a trust. . . ."); *Ross v. Ross*, 233 A.D. 626, 640 (N.Y. Supr. Ct. 1931) ("The intent of the settlor of a trust is a matter of transcendent importance. . . .").

This exact issue was raised in *In re Eastern Concrete Paving Company*, 293 B.R. 704 (E.D. Mich. 2003) where a similar trust provision in an indemnity agreement was invalidated. In *Eastern Concrete*, an indemnity agreement that spoke only to the intent of the surety (as beneficiary) and of the contractor (as trustee), but said nothing about the intention of the settlor (the transferor of the funds), could not and did not either create a trust or impose duties or restrictions upon the debtor with respect to the use of the funds. *Id.* at 709-10; *see also In re Construction Alternatives*, 2 F.3d 670 (6th Cir. 1993) (finding that an express trust had not been created where the only evidence of an express trust is a provision contained in a contractor and a surety indemnity agreement and there was no requirement of segregation). *Eastern Concrete* further stated as follow:

> A provision contained in an indemnity agreement between the surety and contractor purporting to create a trust, **without any evidence of the intention of the settlor to create a trust or impose restrictions on the use of the funds by the purported trustee, is insufficient by itself to create an enforceable express trust**.

*Id.* at 710 (emphasis added).

This makes sense as a beneficiary and a trustee do not create trusts, settlors do. In the case of the Receivables, the purported settlors are the general contractors who owe Debtor money. Debtor knows of no manifestation of any intent by these general contractors that Debtor hold the Receivables in trust for Allied.

F. Conclusion

For the reasons outlined above, Allied is neither a trust beneficiary of the Receivables, nor

does it have a right to the remedy of equitable subrogation as to the Receivables. While it does currently have a security interest in the Receivables, the Receivables are property of the estate and the Bonded Job Letters are a continuing act to collect on a pre-petition claim and a continuing act to collect against property of the estate. As such, Allied must immediately retract the Bonded Job Letters, as it did for the KAST Letter, to comply with the automatic stay.

WHEREFORE, the Debtor respectfully requests entry of an order requiring Allied to issue written retractions of the Bonded Job Letters to each recipient as soon as possible, reserving jurisdiction to hear evidence and argument on potential sanctions and fees for Allied's willful violation of the automatic stay pursuant to § 105 and § 362(k), and granting such other and further relief as is just and equitable.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail and/or CM/ECF to all creditors listed to all parties registering for CM/ECF this 8th day of September, 2015, including Allied National Assurance Company, c/o Jonathan Cohen, Esq., jcohen@jcohenpa.com, 500 East Broward Blvd., Suite 1710, Fort Lauderdale, Florida 33394.

/s/ Michael A. Nardella
Michael A. Nardella, Esq.
Florida Bar No. 051265
Nardella & Nardella, PLLC
250 East Colonial Drive, Suite 102
Orlando, FL 32801
(407) 966-2680
mnardella@nardellalaw.com

Proposed Counsel for Debtors

and

/s/ Roman V. Hammes

Roman V. Hammes, Esq.
Florida Bar No. 087250
Roman V. Hammes, P.L.
250 East Colonial Drive, Suite 305
Orlando, FL 32801
(407) 650-0003
roman@romanvhammes.com

Proposed Counsel for Debtors