UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

PROGRESSIVE PLUMBING, INC.,

Chapter 11

Case No.: 6:15-bk-07275-KSJ

Debtor.

_____/

### RESPONSE IN OPPOSITION TO EMERGENCY MOTION TO COMPEL COMPLIANCE WITH THE AUTOMATIC STAY

Creditor Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company ("Allied"), by and through the undersigned counsel, respectfully submits this Response in Opposition to Debtor Progressive Plumbing, Inc.'s ("PPI") Emergency Motion to Compel Compliance with the Automatic Stay (Doc. 22) (the "Motion to Compel") as follows:

### INTRODUCTION AND SUMMARY OF ARGUMENT

1.      Allied denies that it has violated the automatic stay by refusing PPI's demand to "retract" certain letters of direction Allied sent to the general contractors under various bonded subcontracts with PPI, the purpose of which letters was to ensure that the remaining balances of the bonded subcontracts (collectively, the "Bonded Contract Proceeds") are used for the contractually/statutorily mandated purpose of paying PPI's subcontractors/suppliers.  As reflected by the Motion to Compel, PPI apparently wishes to use the Bonded Contract Proceeds to "cash flow" it is reorganization efforts.  However, PPI is contractually/statutorily obligated to use the Bonded Contract Proceeds to pay its subcontractors/suppliers, and until PPI's subcontractors/suppliers are paid in full, PPI possesses bare legal title to the Bonded Contract Proceeds and cannot use them to "cash flow" its reorganization efforts.  Moreover, in light of Allied's satisfaction of numerous payment bond claims submitted by PPI's

subcontractors/suppliers and Allied's corresponding subrogation rights, Allied possesses a superior interest in the Bonded Contract Proceeds to the extent of Allied's payments relative to the various bonded subcontracts. Thus, Allied possesses equitable/beneficial title to the Bonded Contract Proceeds to the extent necessary to fully reimburse Allied for its payment bond losses. Because the Motion to Compel will be heard in conjunction with the continuation of PPI's Motion to Use Cash Collateral (Doc. 4), this Response further addresses equitable/beneficial interest that PPI's subcontractor/suppliers and Allied possesses relation to the Bonded Contract Proceeds remaining in the general contractors' hands.

2.       In any event, PPI apparently concedes, as it must, that Allied was authorized to send the letters of direction to the general contractors before PPI petitioned for bankruptcy protection, and PPI admits that Allied has not taken any affirmative action following PPI's bankruptcy petition that could conceivably violate the automatic stay.[1] To the contrary, PPI relies upon a number of bankruptcy decisions involving judicial garnishment actions for the proposition that Allied's failure to "retract" the letters of direction somehow violates the automatic stay.

3.       On the one hand, 11 U.S.C. § 362(a)(1) expressly prohibits the commencement or **continuation of** any judicial, administrative, or other action/proceeding against a debtor, such as a garnishment action, which imposes an affirmative obligation upon a creditor to dismiss any such action/proceeding following a debtor's bankruptcy petition. On the other hand, however, PPI has not alleged that Allied has violated 11 U.S.C. § 362(a)(1). Nor could it.

4.       Instead, PPI has alleged that Allied has somehow violated 11 U.S.C. § 362(a)(3), (4), & (5) through inaction, but those provisions only prohibit **post-petition acts/action**. In fact,

---

[1] PPI challenged Allied's authority to send a letter of direction to a general contractor on a non-bonded contract. However, Allied has voluntarily retracted that letter of direction.

PPI has not cited a single case suggesting that a surety is required to "retract" a pre-petition letter direction or that a creditor is affirmatively required to take post-petition actions to avoid stay violations outside of the context of judicial, administrative, or other legal actions/proceedings governed by 11 U.S.C. § 362(a)(1).

5.      In reality, Allied has not taken any action whatsoever in relation to the letters of direction following PPI's petition for bankruptcy protection, and Allied is not under any obligation to "retract" the letters of direction at this time.  Allied's only duty following the filing of PPI's bankruptcy petition was to refrain from committing any affirmative, post-petition act that would disturb the *status quo* as of the petition date.  Allied has complied with that duty. Consequently, Allied has not violated the automatic stay.

<u>SUMMARY OF RELEVANT FACTS</u>

6.      The Motion to Compel confirms that PPI is a commercial plumbing subcontractor who executed an Agreement of Indemnity in favor of Allied in 2013 (the "Indemnity Agreement") to induce Allied to issue various performance and payment bonds on behalf of PPI relative to its plumbing subcontracts.  (Doc. 2, ¶ 9, Doc. 22, ¶¶ 5-6).  Allied has attached a copy of the Indemnity Agreement as **Exhibit 1** for the Court's convenience.

7.      Among other things, the Indemnity Agreement clarifies that (1) PPI is a mere trustee in relation to any Bonded Contract Proceeds it receives and (2) the sole purpose of the Bonded Contract Proceeds is the satisfaction of obligations for which Allied would be liable under the bonds it issued on behalf of PPI.  Specifically, under Section 3.8 of the Indemnity Agreement, entitled "TRUST FUNDS," PPI and others expressly covenanted and agreed:

> **[T]o hold as a trust fund and/or as a constructive or equitable trust**, all interest, title and rights in any contract or undertaking referred to in any Bond, or in, arising in any matter out of, or any Bond **including but not limited to payments for or on account of any contract, in which the Surety has an**

> **interest, which will inure to [Allied's] benefit** for any liability for Loss it may have or sustain under any Bond; and, further, **it is expressly declared that all moneys due or to become due under any contract covered by any Bond are trust funds, whether in the Indemnitors' possession or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract for which [Allied] would be liable under any Bond**; said trust also inures to [Allied's] benefit for any liability or Loss it may have or sustain under any Bond or under this Agreement, and this Agreement constitutes notice of such trust.

(Emphasis added).  The Indemnity Agreement also requires PPI and others to indemnify and hold Allied harmless from all liability for and all "Loss."

8.      In addition to agreeing to hold all Bonded Contract Proceeds in trust for the benefit of Allied, PPI and others assigned various rights to Allied as collateral for the duty to indemnity Allied against "Loss."  As reflected by Section 5.1 of the Indemnity Agreement, PPI specifically granted Allied a security interest in "**any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds including, but not limited to, all percentages retained, progress payments, deferred payments, compensation for extra work and proceeds of damage claims**."  (Emphasis added).

9.      With respect to the various "Events of Default" giving rise to Allied's right to take possession of the collateral assigned to it, including "any and all sums that may be due" under any bonded contract (*i.e.*, the Bonded Contract Proceeds), Section 5.2 of the Indemnity Agreement further provides:

> [Allied], or any persons [Allied] designates, may enforce the security interest granted herein and **may take, and are hereby authorized and empowered by each Principal and each Indemnitor to take, any action necessary to obtain possession of the funds, rights and property subject thereto if any of the following occur** (each and "Event of Default"):

> (1)      any abandonment, breach of or failure, refusal or inability to perform, any contract referred to in the Bonds **or of any breach of any said Bonds**;

    (2)    **a failure by any Principal or Indemnitor, or delay, refusal, or inability to pay bills or other indebtedness incurred in, or in connection with, the performance of any contract covered by a Bond**;

    (3)    any breach of an obligation set forth in Article III of this Agreement;

    (4)    any Indemnitor's assignment for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for any Indemnitor or its property, whether insolvent or not, **or any Indemnitor's application for reorganization or arrangement under the terms of the United States Bankruptcy Code** or any similar laws of any state, possession or territory of the United States, or if other Persons initiate such proceedings, the continuance of those proceedings for a period of thirty days . . . .

(Emphasis added).  Accordingly, numerous "Events of Default" have occurred, and Allied's right to take possession/control of the Bonded Contract Proceeds was triggered before PPI petitioned for bankruptcy protection.

    10.    Notwithstanding PPI's erroneous assertion to the contrary, Allied perfected the assignment/security interest granted by the Indemnity Agreement on February 10, 2015, well more than 90 days before PPI petitioned for bankruptcy protection.  In that regard, Section 7.13 of the Indemnity Agreement specifically authorized Allied to utilize the Indemnity Agreement as a Financing Statement under the Uniform Commercial Code.  As authorized by the Indemnity Agreement, Allied perfected its security interest by filing the Indemnity Agreement as a Financing Statement with the Florida Secretary of State on February 10, 2015, a copy of which is attached hereto as **Exhibit 2**.  A UCC3 financing statement amendment form, a copy of which is attached hereto as **Exhibit 3,** was filed on August 6, 2015 revising the secured party's name from Allied World Insurance Company to Allied World Specialty Insurance Company.

    11.    In reliance upon its rights under the Indemnity Agreement, Allied issued various performance and payment bonds on behalf of PPI in relation to PPI's plumbing subcontracts in Tennessee, Georgia, Florida, and South Carolina (collectively the "Bonded Contracts").  Allied

has incurred significant "Loss' under the its payment bonds consisting of, among other things, payments to PPI's subcontractors/suppliers, and Allied sent the letters of direction at issue in an effort to ensure that the remaining Bonded Contract Proceeds are used to pay PPI's subcontractor/suppliers under the Bonded Contracts.

12.    Allied's payment bond "Loss" and the remaining Bonded Contract Proceeds can be described as follows (upon information and belief):

| Bond Type | Bond No. | Obligee | Project | Penal Sum | Total Payments to Claimants | Remaining Bonded Contract Proceeds[3] |
|---|---|---|---|---|---|---|
| Subcontract Payment Bond | D00000007 | Kellogg & Kimsey, Inc. | 1800 West End Hotel & MX Development | $1,750,000 | $141,046.46 | $175,845 |
| Labor and Materials Payment Bond | D00000181 | Pinkerton & Laws of Georgia, Inc. | Westin Jekyll Island, Jekyll Island, GA | $1,469,918 | $0 | $58,127 |
| Subcontract Labor and Material Payment Bond | D00000182 | The Evergreen Corporation d/b/a Evergreen Construction | Hyatt Place Columbia, Columbia, South Carolina | $730,800 | $121,096.40 | $72,643 |
| Subcontract Labor and Material Payment Bond | D00000183 | D&D Construction Services of Orlando, Inc. | Concord Orlando Courtyard, Orlando, FL | $615,000 | $92,501.09 | $0 |
| Subcontract Labor and Material Payment Bond | D00000185 | D&D Construction Services of Orlando, Inc. | Maderia Beach Courtyard, Maderia Beach, FL | $494,990 | $67,764.25 | $0 |
| Subcontract Labor and Material Payment Bond | D00000186 | The Evergreen Corporation d/b/a Evergreen Construction | Hyatt House @ Downtown, Atlanta, GA | $978,000 | $147,384.28 | $168,396 |

---

[3] Allied's calculation of the remaining Bonded Contract Proceeds under each Bonded Contract is based upon the information Allied currently has at its disposal.  Allied expressly reserves in all rights, remedies, and defenses, at law or in equity, it may possess in relation to the proper calculation of the remaining Bonded Contract Proceeds.

| Bond Type | Bond No. | Obligee | Project | Penal Sum | Total Payments to Claimants | Remaining Bonded Contract Proceeds[3] |
|---|---|---|---|---|---|---|
| Subcontract Labor and Material Payment Bond | D00000187 | WELBRO Building Corporation | Residence Inn by Marriott, Orlando, FL | $996,200 | $121,804.75 | $146,039 |
| | | | | Total | $691,597.23 | $621,050.00 |

**Thus, Allied has already made payments to PPI's subcontractors/suppliers totaling $691,597.23, which exceeds the remaining Bonded Contract Proceeds by $70,547.23.**

13.    While PPI erroneously claims that "[o]n all but one of the jobs from which [Allied] demanded payment [PPI] was not in default" (Doc. 22, p. 4), PPI had in fact defaulted on its payment obligations to its subcontractors/suppliers on six of the Bonded Contracts, which resulted in Allied's "Loss" under six different payment bonds.  Moreover, other payment bond claims have been asserted, and Allied continues to face significant exposure under numerous performance bonds it issued on behalf of PPI.

14.    Because Bonded Contract Proceeds remain in the hands of the general contractors with whom PPI subcontracted, the terms of the Bonded Contracts and various state laws governing those subcontracts are relevant to the interests of PPI, PPI's subcontractors/suppliers, and Allied in the Bonded Contract Proceeds.

15.    For example, the Tennessee subcontract between PPI and Kellogg & Kimsey, Inc. ("K&K"), a copy of which is attached hereto as **Exhibit 4** (the "1800 West End Subcontract"), specifically authorizes K&K to pay portions of the Bonded Contract Proceeds directly to PPI's subcontractor/suppliers.   More specifically, Paragraph 21 of the 1800 West End Subcontract provides, in pertinent part:

> **[PPI] shall pay promptly for all materials, labor and equipment used in performance of this AGREEMENT**.  [PPI] shall protect the PROJECT and shall assume liability, indemnify, defend and hold harmless [K&K], [K&K's] Surety,

and Owner from and against all claims, bond claims, equitable liens, constructions [sic] liens, damages, losses and expenses in any way related to [PPI's] WORK on account of [PPI's] failure to pay, including, but without limitation, court costs, reasonable attorneys' fees, reasonable appellate attorneys' fees, paralegal fees and disbursements paid or incurred by OWNER and/or [K&K] in connection therewith. **Should [PPI]: a) fail to make timely payment to its suppliers, sub-subcontractors, laborers or fringe benefit funds . . . [K&K], in its sole discretion, may make direct payments to such individuals or entities and reduce the SUBCONTRACT SUM accordingly.**

(Emphasis added). Because PPI failed to make timely payments to its subcontractors/suppliers, which resulted in payment bond "Loss" to Allied totaling $141,046.46 to date, K&K's right to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers has been triggered. The 1800 West End Subcontract is also subject to Tennessee's criminal contract payment misapplication statute (the "Tennessee Misapplication Statute"), under which PPI may be guilty of a Class E Felony if it uses funds received from K&K "for any purpose other than" payment to PPI's subcontractors/suppliers. The 1800 West End Subcontract is also subject to the Tennessee Prompt Pay Act of 1991 (the "Tennessee Prompt Pay Act"), under which all payments received or to be received are to be "held by [PPI] in trust" for the benefit of PPI's subcontractors/suppliers. By agreeing to perform a subcontract governed by the Tennessee Misapplication Statute and the Tennessee Prompt Pay Act, PPI knew or should have known that it could not treat the Bonded Contract Proceeds received from K&K as PPI's own absolute property, but was instead obligated to hold those funds in trust and apply them to the payment of its subcontractors/suppliers, which was sufficient to create a valid and enforceable express trust under Tennessee law.

16.    Similarly, the subcontract between PPI and Pinkerton & Laws of Georgia, Inc. ("Pinkerton") attached hereto as **Exhibit 5** (the "Westin Jekyll Island Subcontract") and the subcontract between PPI and The Evergreen Corporation d/b/a Evergreen Construction

("Evergreen") attached hereto as **Exhibit 6** (the "Hyatt House Downtown Atlanta Subcontract"), both of which relate to projects in Georgia, expressly dictate that (1) PPI receives/holds all payments in trust for PPI's subcontractors/suppliers and (2) Pinkerton and Evergreen have the right to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers.  In that regard, Paragraph E.4 of the Westin Jekyll Island Subcontract states in pertinent part:

> **[PPI] agrees that all payments received shall be used solely for the benefit of persons or firms supplying labor, materials, supplies, tools, equipment or services for the Project, and that money paid to [PPI] shall immediately become and constitute a trust for the benefit of such persons and firms and shall not be directed to any other purpose until all obligations arising hereunder have been satisfied**.

(Emphasis added).   Paragraph E of the terms and conditions of the Westin Jekyll Island Subcontract further states in pertinent part, "If [PPI] fails to pay for any labor, services, or materials used are purchased for use in the prosecution of [PPI's] Work, [Pinkerton] **may, at its option, notwithstanding anything herein to the contrary, and without notice to [PPI], pay any such claims and deduct the amounts thereof from the amounts owed to [PPI]**." (Emphasis added).   Paragraph 5 of Hyatt House Downtown Atlanta Subcontract designates payments received/held as trust funds for the benefit of PPI's subcontractor/suppliers and permits Evergreen to withhold payments from PPI upon receipt of claims from PPI's subcontractors/suppliers as follows:

> **[PPI] will receive the payments made by [Evergreen] and [PPI] will hold such payments as a trust fund to be applied first to the payment of laborers, suppliers, subcontractors and others responsible for the Work for which such payments are made, including sufficient funds to ensure that all taxes and insurance applicable thereto are also paid.  [PPI] shall first apply all progress payment as trustee to satisfy all obligations Subcontractor has incurred due to the Work.**

. . . .

> **[Evergreen] reserves the right to withhold, as an additional reserve and without limiting its other rights and remedies, an amount sufficient: (a) to defend, satisfy and discharge any asserted claim that [PPI] (or anyone providing any of the Work hereunder) has failed to make payment for labor, services, materials, equipment, taxes, or other items were obligations furnished or incurred in connection with the Work** or has caused damage to the Work or to any other work on the Project; (b) to complete the Work if it appears that funds remaining in the Subcontract, including retainage and exclusive of back charges are insufficient to complete the work; (c) to reimburse [Evergreen] for any back charges incurred as a result of any act or omission by [PPI] hereunder; (d) to protect [Evergreen] from the possible consequences of any other breach or default by [PPI] hereunder; or (e) to secure [Evergreen] with respect to any breach or default by [PPI] or its affiliates, parent company and subsidiaries under any other agreement.

> Payment hereunder shall not be evidence of the proper performance or progress of the Work and no payment shall be construed to be acceptance of defective, faulty or improper work or materials.

(Emphasis added).  With respect to Evergreen's right to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers, Paragraph 3 of the Hyatt House Downtown Atlanta Subcontract also states, in pertinent part, that "[Evergreen] reserves the right . . . **to directly pay any and all of [PPI's] subcontractors or suppliers into deduct all amounts so paid from the amounts otherwise do [PPI].**"  (Emphasis added).  Furthermore, as explained in more detail below, any payments received/to be received by PPI for work performed by its subcontractors/suppliers relative to these subcontracts are impressed with a constructive trust in favor of those subcontractor/suppliers under Georgia law.

17.     Paragraph 19 of the terms and conditions of the Florida subcontract between PPI and WELBRO Building Corporation ("WELBRO") attached hereto as **Exhibit 7** (the "Residence Inn Orlando Subcontract") also specifically authorizes WELBRO to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers as follows:

> 19.3 If at any time there shall be evidence of lien or claim for which, if established, [WELBRO] or Owner might become liable, and which is chargeable to [PPI], **[WELBRO] shall have the right to retain out of any**

**payment due, or to become due under this Agreement or any other Agreement between the Contractor and Subcontractor, an amount sufficient to indemnify [WELBRO] and Owner against such lien or claim, including, without limitation, interest, court costs and expenses and attorneys' fees which might be incurred in defending against such lien, removing it to bonded or otherwise clearing title to the Projec**t. Should any claim or lien developed after all payments are made, [PPI] shall refund [WELBRO] all monies that the latter may be compelled to pay in discharging such claims or liens or incurred in collecting said monies from [PPI].

. . . .

19.5  [PPI] agrees to provide [WELBRO] with a list of [PPI's] suppliers and sub-subcontractors.  This list is to be submitted together with [PPI's] first Request for Payment, **and may be used at the discretion of [WELBRO] for making checks jointly payable or directly to any supplier or sub-subcontractor**.

(Emphasis added).  Upon information and belief, PPI's other Florida subcontracts designate payments received by PPI's as trust funds to be held for the benefit of PPI's subcontractors/suppliers and/or authorize the general contractor to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers, but Allied does not possess copies of those other Florida subcontracts. Nonetheless, Allied does not believe any Bonded Contract Proceeds remain under those other Florida subcontracts.

18.    Allied also does not possess a copy of the South Carolina subcontract between PPI and Evergreen (the "Hyatt Place Columbia Subcontract").  However, based upon the terms of Hyatt House Downtown Atlanta Subcontract between PPI and Evergreen discussed above, Allied anticipates that the Hyatt Place Columbia Subcontract between PPI and Evergreen expressly dictates that (1) PPI receives/holds all payments in trust for PPI's subcontractors/suppliers and (2) Evergreen has the right to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers.  Moreover, the Hyatt Place Columbia Subcontract is subject to S.C. Code Ann. § 29-7-10, which (1) obligates PPI to pay its subcontractors/suppliers

"out of the money received" from Evergreen and (2) grants PPI's subcontractors/suppliers "a first lien on the money received by [PPI]" under the Hyatt Place Columbia Subcontract.

19.     Based upon Allied's payment bond "Loss" and its remaining exposure under its performance and payment bonds, **and prior to PPI's petition for bankruptcy protection**, Allied sent the letters of direction attached as Exhibit A to the Motion to Compel in an effort to ensure that the remaining Bonded Contract Proceeds are utilized to pay PPI's subcontractors/suppliers under the Bonded Contracts.  (Doc. 22, Ex. A).  Each of the letters of direction requests the obligee/beneficiary "to make ANY and ALL current and future payments due to PPI directly to [Allied] for [Allied's] **direct distribution to all properly performing subcontractors and suppliers and/or for reimbursement for project related losses**."  (Id.) (emphasis added).

20.     The Motion to Compel states, "The Letters may have been sent prepetition, but they continue to have the effect that [Allied] desired, namely to put pressure on [PPI] to pay its debts to [Allied] or face the consequences of failing to receive any funds on these jobs"; however, that is a mischaracterization of the purpose and intent of the letters of direction.  The true purpose/intent of the letters of direction is to ensure that the remaining Bonded Contract Proceeds are used for the contractually/statutorily mandated purpose of paying PPI's subcontractors/suppliers under the Bonded Contracts. By satisfying payment bond claims, Allied has subrogated to the equable/beneficial interests that PPI's subcontractors/suppliers possess in the remaining Bonded Contract Proceeds, which interests are superior to any interest PPI may possess.

21.     Nonetheless, Allied has not received any Bonded Contract Proceeds in response to the letters of direction, and none of the obligees/beneficiaries have indicated that they would

otherwise be willing to pay any Bonded Contract Proceeds to PPI but for Allied's issuance of the letters of direction.  As noted above, Allied believes that no remaining Bonded Contract Proceeds are in the general contractors' hands relative to two of PPI's Florida subcontracts, so Allied's letters of direction to those general contractors do not have any post-petition effect. Moreover, upon information and belief, several of the obligees/beneficiaries deny that portions of the Bonded Contract Proceeds are actually owed to PPI.

## ALLIED HAS NOT VIOLATED THE AUTOMATIC STAY BY REFUSING PPI'S DEMAND THAT ALLIED  "RETRACT" THE LETTERS OF DIRECTION

22.    Regardless of the competing interests of PPI and Allied in the Bonded Contract Proceeds, Allied has not violated the automatic stay by refusing PPI's demand that Allied "retract" the letters of direction.  As noted above, Allied undisputedly has not taken any affirmative action following PPI's bankruptcy petition that could conceivably violate the automatic stay.  More importantly, PPI's attempt to compare Allied's decision to refrain from "retracting" the letters of direction to a creditor's refusal to dismiss a judicial garnishment action lacks merit for a number of reasons.

23.    Under 11 U.S.C. § 362(a), **the continuation** of a garnishment action and other types of judicial, administrative, legal actions are treated differently than other acts that may violate the automatic stay, and creditors are expressly prohibited from **the continuation** of garnishment actions and other judicial/administrative/legal actions after the filing of a bankruptcy petition.  In that regard, 11 U.S.C. § 362(a) provides:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

(1) **the commencement  or continuation**, including the issuance or employment of process, **of a judicial, administrative, or other action or**

**proceeding against the debtor** that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

. . . .

(3) **any act** to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) **any act** to create, perfect, or enforce any lien against property of the estate; [or]

(5) **any act** to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title . . . .[4]

(Emphasis added).   11 U.S.C. § 362(a)(1), which relates solely to judicial, administrative, or other legal actions/proceedings, is the only portion of the statute that prohibits the "continuation" of a pre-petition action.   On their face, Sections 362(a)(3), (4), and (5) only prohibit post-petition acts/actions — as opposed to post-petition inaction by a creditor.

24.     PPI cites this Court's decision in *In re Mims*, 209 B.R. 746 (Bankr. M.D. Fla. 1997) for the generic proposition that "the automatic stay often requires creditors to undo collection actions and processes which a creditor initiated prior to a bankruptcy filing" (Doc. 22, p. 5); however, this Court's decision in *Mims* was premised upon 11 U.S.C. § 362(a)(1), which was not implicated by Allied's letters of direction because they do not involve a judicial/administrative/legal action against PPI.   The creditor in *Mims* had obtained a final judgment against the debtor and served a judicial writ of garnishment upon the debtor's bank, which resulted in the debtor's bank freezing the funds in the debtor's account.   209 B.R. at 747-48.   After the debtor petitioned for bankruptcy, the creditor "refused to dismiss the garnishment action contending that it had no affirmative duty to take any action to release the garnished

---

[4] PPI has not accused Allied of violation 11 U.S.C. § 362(a)(2), (6), (7), or (8).  (See Doc. 22).

funds." *Id*. at 748.   This Court highlighted the uniqueness of a garnishment action and the corresponding duty of a creditor to take affirmative action to prevent the continuation of the garnishment action after learning of the bankruptcy petition as follows:

> The automatic stay directly **prohibits the "continuation" of any judicial action against the debtor or any act to collect any debt which arose prior to bankruptcy**.   Clearly, a garnishment proceeding is a judicial action against the debtor and is stayed by 11 U.S.C. § 362.   **However, a garnishment action is unique insofar as it requires affirmative action to comply with the requirements of the automatic stay.**

*Id*. (emphasis added) (internal citations omitted).   This Court further explained:

> The proper and required affirmative action is dismissal of the garnishment by the party seeking the garnishment.   **A creditor pursuing a garnishment** simply cannot sit back and wait for the debtor to act because the effect is to continue to deprive the debtor of property in the possession of the garnishee or the state court in violation of the automatic stay.

*Id*. (emphasis added).   Neither 11 U.S.C. § 362(a) nor this Court's decision in *Mims* requires a creditor to "undo" or "retract" all otherwise authorized, pre-petition acts/actions that could conceivably have a continuing, post-petition effect.

    25.    PPI also cites *Elder v. City of Thomasville*, 12 B.R. 491 (Bankr. M.D. Ga. 1981) for the generic proposition "[i]f a creditor puts in place collection activities that will continue to have effect post-petition, '[n]o action is unacceptable' because 'no action is to thwart the effectiveness of the automatic stay'" (Doc. 22, p. 5); however, that case also involved a garnishment action, the continuation of which is expressly prohibited by 11 U.S.C. § 362(a)(1). Like the creditor in *Mims*, the creditor in *Elder* obtained a pre-petition judgment against the debtor and instituted "continuing garnishment proceedings" against the debtor, which the creditor refused to dismiss after it learned of the bankruptcy petition.   12 B.R. at 492.   While focusing its analysis on 11 U.S.C. § 362(a)(1) and the unique nature of garnishment and other judicial, administrative, or legal actions, the *Elder* court explained:

> **Part of what is stayed in 11 U.S.C. s 362 is "<u>continuation</u>." Garnishment involves a creditor, a garnishee, and a court.** Creditor sets in motion the process. Creditor is in the driver's seat and very much controls what is done thereafter if it chooses. **If the "continuation" is to be stayed, it cannot choose to do nothing and pass the buck to the garnishee or the court in which the garnishment is filed to effectuate the stay. Positive action on the part of the creditor is necessary <u>so that "continuation" may be stayed.</u>**

*Id.* at 494 (emphasis added). The ban on "continuation," which may require a creditor to take affirmative action to "undo" or "retract" pre-petition acts, does not apply to 11 U.S.C. § 362(a)(3), (4), and (5) and, therefore, the *Elder* decision does not support PPI's argument.

26.     PPI also cites *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210 (9th Cir. 2002) in support of its argument that a creditor must "undo" or "retract" any "collection action" that may have a post-petition effect, but that case demonstrates that the prohibited post-petition continuation of a "collection action" is limited to a judicial, administrative, or other legal actions against the debtor. In *Leetein*, the creditor filed a "state collection action" against the debtor after the debtor petitioned for bankruptcy protection. *Id.* at 1212. After the creditor and it is attorney were sanctioned for failing to dismiss or stay the "state collection action," they argued "that federal bankruptcy law imposes no affirmative duty to discontinue post-petition state collection actions." *Id.* Like the courts in *Mims* and *Elder*, the *Leetein* court focused its analysis on 11 U.S.C. § 362(a)(1) and explained:

> This statute is unambiguous. **The plain language of § 362(a)(1) <u>prohibits the continuation of judicial actions</u>**. Section 362(h) permits a person injured by any willful violation to recover actual and punitive damages. The continuation against judicial actions includes the maintenance of collection actions filed in state court. It contradicts the plain meaning of the statute to suggest that the § 362(a)(1) stay against the continuation of judicial actions does not prohibit the maintenance of an active collection action or the unjustified delay in the dismissal of such. A party violating the automatic stay, through continuing a collection action in a non-bankruptcy forum, must automatically dismiss or stay such proceeding or risk possible sanctions for willful violations pursuant to § 362(h).

Consequently, instead of generically referencing a "collection action" as any act that could potentially have a post-petition effect as PPI suggests, the *Leetein* court was referencing the continuation of judicial actions.

27.     Allied's refusal to adhere to PPI's demands that Allied "retract" the letters of direction is more analogous to the Internal Revenue Service's failure to notify the debtor's bank to "ignore" a pre-petition Notice of Levy following the debtor's petition for bankruptcy protection, which did not constitute a violation of the automatic stay in *In re Quality Health Care*, 215 B.R. 543 (Bankr. N.D. Ind. 1997).   In that case, the debtor argued that, once the IRS had notice of the debtor's bankruptcy, "[the IRS] should have notified the Bank to not turn the funds in the Debtor's bank account over to [the IRS] pursuant to its prepetition Notice of Levy." *Id*. at 579.   While rejecting the debtor's argument that the IRS had violated the automatic stay by not "undoing" or "retracting" it is Notice of Levy, the court explained:

> The Court perceives one possible basis to conclude that the two postpetition failure or refusals to act by the IRS (i.e. notify the Bank to not honor the prepetition Notice of Levy, and the failure or refusal of the IRS to turnover to the Trustee the proceeds of the Bank account after demanded to do so by the Trustee) could conceivably constitute a violation of the § 362(a) automatic stay.   The relief requested by the Trustee might be premised on § 362(a)(3), which provides that the Debtor's Petition operates as a stay of "an act to obtain possession of property of the estate or property of the estate, or to exercise control over property of the estate."
>
> The facts are undisputed that the IRS was placed in constructive possession of the Bank account prepetition, when it issued the Notice of Levy to the Bank on April 30, 1996, **and did not obtain postpetition possession of the proceeds of the Bank account by an affirmative or positive act on its part.   It did nothing postpetition regarding the Notice of Levy.   Based on the foregoing analysis the Court does not find that the failure or refusal of the IRS to notify the Bank postpetition that it should not honor the prepetition Notice of Levy constitutes a violation of § 362(a)(3), <ins>as the IRS had no such duty. The IRS only had a duty to not commit any affirmative, postpetition act that would disturb the *status quo* as of the Petition date.   This it did not do . . . . Thus, based upon the above analysis, there was no stay violation by the IRS in not</ins>**

**volunteering postpetition to waive any of its rights under the prepetition Notice of Levy**.

*Id*. at 579-80 (emphasis added).

28.     Similarly, Allied's letters of direction were issued before PPI petitioned for bankruptcy protection, Allied has not received any Bonded Contract Proceeds in response to the letters of direction, and Allied has not taken any affirmative action whatsoever relative to the letters of direction following PPI's bankruptcy petition.  Like the IRS in *Quality Health Care*, Allied has not taken any action that would disturb the *status quo* as of PPI's petition date.  Two of the letters of direction have no post-petition effect because no Bonded Contract Proceeds exist under two of PPI's Florida subcontracts.

29.     Therefore, regardless of whether PPI possesses any equitable/beneficial interest in the remaining Bonded Contract Proceeds in the hands of the general contractors (which Allied denies for the reasons set forth below), Allied has not violated the automatic stay by refusing PPI's demand to "retract" the letters of direction, and the Motion to Compel should be denied.

## PPI DOES NOT POSSESS ANY EQUITABLE/BENEFICIAL INTEREST IN THE REMAINING PROCEEDS OF THE BONDED CONTRACTS

30.     As noted above, the true purpose/intent of the letters of direction was to ensure that the Bonded Contract Proceeds are used for the contractually/statutorily mandated purpose of paying PPI's subcontractors/suppliers under the Bonded Contracts.  PPI is not entitled to treat the Bonded Contract Proceeds it has received or may receive under the Bonded Contracts as its own absolute property.  Instead, the Indemnity Agreement, the terms of the Bonded Contracts, and numerous state laws governing the Bonded Contracts require PPI to utilize the Bonded Contract Proceeds to pay PPI's subcontractors/suppliers for the labor, material, equipment, etc. they furnished to PPI relative to the Bonded Contracts.  Moreover, each of the Bonded Contracts at

issue specifically authorize the general contractors to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers.  Hence, to the extent the Bonded Contract Proceeds relate to work performed by PPI's subcontractors/suppliers, PPI is nothing more than a conduit through which the Bonded Contract Proceeds must flow to PPI's subcontractors/suppliers, and PPI cannot use those Bonded Contract Proceeds to "cash flow" its reorganization efforts.

31.    On the one hand, as the Eleventh Circuit has held, PPI's bankruptcy estate consists of "all legal and equitable interests of [PPI] in property as of the commencement of the case." *T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989). Moreover, "[t]he extent and validity of [PPI's] interest in property is a question of state law." *Id*. On the other hand, however, 11 U.S.C. § 541(d) states:

> Property in which the debtor holds, as of the commencement of the case, **only legal title and not an equitable interest** . . . becomes property of the estate under subsection (a)(1) or (2) of this section **only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold**.

(Emphasis added).   The Eleventh Circuit has explained that "[t]he legislative history of 11 U.S.C.A. § 541 makes it clear **that funds in the debtor's possession held for a third-party do not become part of the estate in bankruptcy** . . . ."  *T & B Scottdale Contractors*, 866 F.2d at 1376 (emphasis added).  Another court has explained:

> **The United States Supreme Court has stated that Congress has plainly excluded from the estate the property of others held by the debtor in trust at the time of the filing of the petition**.  *United States v. Whiting Pools, Inc*., 462 U.S. 198, 205 fn. 10, 103 S.Ct. 2309, 2314 fn. 10, 76 L.Ed.2d 515 (1983).  We stated in *In re Gurs*, 34 B.R. 755, 757 (9th Cir. BAP 1983), **that where the debtor possesses only a legal and not an equitable interest in property, the equitable interest does not become part of the estat**e. *See also In re Flight T*ransp. *Corp. Securities Litigation*, 730 F.2d 1128, 1136 (8th Cir.1984).   Other sections of the Code such as Sections 548 and 547 **cannot be used to allow a bankruptcy estate to benefit from property that the debtor did not own**. *See Matter of Quality Holstein Leasing*, 752 F.2d 1009, 1013 (5th Cir.1985).

*Matter of Torrez*, 63 B.R. 751 (B.A.P. 9th Cir. 1986) *aff'd sub nom. In re Torrez*, 827 F.2d 1299 (9th Cir. 1987) (emphasis added).

32.     A detailed below, to the extent PPI has received or may receive Bonded Contract Proceeds under the Bonded Contracts, PPI would merely hold those Bonded Contract Proceeds in trust for the benefit of Allied and PPI's subcontractors/suppliers.  Thus, PPI does not possess any equitable/beneficial interest in the Bonded Contract Proceeds and PPI cannot use the Bonded Contract Proceeds as part of its reorganization efforts until all of PPI's subcontractors/suppliers are paid in full.  Furthermore, by satisfying their payment bond claims, Allied has subrogated to the equitable/beneficial interests possessed by PPI's subcontractors/suppliers and Allied, therefore, possesses a superior interest in the Bonded Contract Proceeds to the extent necessary to reimburse Allied for its payment bond "Loss."

**The Indemnity Agreement**

33.     As explained more fully in Allied's Response in Opposition to Emergency Motion to Use Cash Collateral, Notice of Non-Consent of Use of Cash Collateral, and Request for Adequate Protection Under 11. U.S.C. § 363 (Doc. 24), the Indemnity Agreement clarifies that (1) PPI is a mere trustee in relation to any Bonded Contract Proceeds it has or may receive and (2) the sole purpose of the Bonded Contract Proceeds is the satisfaction of obligations for which Allied would be liable under the bonds it issued on behalf of PPI — namely the payment of PPI's payment of its subcontractors/suppliers relative to the Bonded Contracts.  Thus, the Indemnity Agreement clarifies that Allied and PPI's subcontractors/suppliers possess the equitable/beneficial interests in the Bonded Contract Proceeds, which prevents those equable/beneficial interest from becoming part of PPI's bankruptcy estate under 11 U.S.C. § 541(d).

34.     Allied also possesses a superior interest in the Bonded Contract Proceeds in its capacity as a secured creditor.  As collateral for its indemnity and other obligations to Allied, PPI and others specifically assigned an/or granted a security interest in, among other things, "any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds" under Section 5.1.1 of the Indemnity Agreement.   Allied perfected that assignment/security interest long before PPI petitioned for bankruptcy protection.   The Indemnity Agreement expressly authorizes and empowers Allied to take "any action necessary to obtain possession of the funds" upon the occurrence of an "Event of Default."   Numerous "Events of Default" have incurred under the Indemnity Agreement, including PPI's failure to pay its subcontractors/suppliers relative to the Bonded Contracts and PPI's petition for bankruptcy protection.   Consequently, Allied possesses a superior right to possession of any Bonded Contract Proceeds paid or to be paid under the Bonded Contracts.

**The 1800 West End Subcontract**

35.     Though Allied has sustained payment bond "Loss" totaling $141,046.46 relative to PPI's subcontractors/suppliers under the 1800 West End Subcontract and K&K appears to be holding Bonded Contract proceeds of at least $175,845, Allied did not send a letter of direction to K&K relative to the 1800 West End Subcontract.  Nevertheless, as explained in Paragraph 16 above, Paragraph 21 of the 1800 West End Subcontract specifically authorizes K&K to pay the remaining Bonded Contract Proceeds of $175,845 directly to PPI's subcontractors/suppliers. Upon information and belief, K&K contends that no payment is currently due to PPI under the 1800 West End Subcontract.  Nonetheless, to the extent any Bonded Contract Proceeds of the 1800 West End Subcontract have or may be paid to PPI, those Bonded Contract Proceeds would

be impressed with an express trust in favor of PPI's subcontractors/suppliers under the Tennessee Misapplication Statute and/or Tennessee's Prompt Pay Act.

36.    As a preliminary matter, the statutory requirements for creating an express trust under Tennessee law are articulated in Tenn. Code Ann. § 35-15-402(a), which provides, in relevant part:

> A trust is created only if: (1) The settlor has capacity to create a trust; (2) The settlor indicates an intention to create the trust; (3) The trust has a definite beneficiary . . . ; (4) The trustee has duties to perform; and (5) The same person is not the sole trustee and sole beneficiary."

Tenn. Code Ann. § 35-15-106 clarifies that Tennessee's common law of trusts supplement those statutory requirements.  The Sixth Circuit has described the common law test for creating an express trust as follows, "[W]here a person has or accepts possession of personal property **with the express or implied understanding that he is not to hold it as his own absolute property, but is to hold and apply it for certain specific purposes or for the benefit of certain specified persons, a valid and enforceable express trust exists**." *In re Cannon*, 277 F.3d 838, 50 (6th Cir. 2002) (emphasis added). Under that rationale, the proceeds of the 1800 West End Subcontract were impressed with an express trust for the benefit of ESH's subcontractors/suppliers under Tennessee law because PPI accepted them with the express or implied understanding that it was statutorily/contractually obligated to utilize those funds for the sole purpose of paying its subcontractors/suppliers as required by the Tennessee Misapplication Statute and the Tennessee Prompt Pay Act.

37.    Tennessee's Misapplication Statute, which is codified at Tenn. Code Ann. § 66-11-138 provides, in pertinent part:

> (a)(1)    Any prime contractor or remote contractor who, with intent to defraud, uses the proceeds of any payment made to that contractor on account of improving certain real property **for any purpose other than to pay for**

> **labor performed on, or materials, services, equipment, or machinery furnished by that contractor's order for the real property**, and overhead and profit related thereto, while any amount for the labor, materials, services, equipment, machinery, overhead, or profit remains unpaid shall be liable to an injured party for any damages and actual expenses incurred, including attorneys' fees, if the damages and expenses incurred are the result of the misapplication of the payment.
>
> (2)    A violation of subdivision (a)(1) is a Class E felony.

(Emphasis added).  While construing a prior version of the Misapplication Statute, the Tennessee Supreme Court noted that "[a] statute of this nature is intended to make the payments to the contractor **trust funds for the payment of labor and materials**." *Daugherty v. State*, 393 S.W.2d 739, 741 (Tenn. 1965) (emphasis added).  In *Sequatchie Concrete Serv., Inc. v. Cutter Labs.*, 616 S.W.2d 162 (Tenn. Ct. App. 1980), the Tennessee Court of Appeals noted that the Misapplication Statute **was alone** insufficient to give rise to an express trust under Tennessee law because, "[w]hile several states have statutes explicitly making funds paid to a contractor a trust for the benefit of laborers and materialmen, **Tennessee only has [the misapplication statute]**, which imposes criminal liability for misapplication of contract payments before debts to subcontractors have been satisfied." *Id.* at 166 (emphasis added).  However, the Tennessee General Assembly subsequently enacted the Tennessee Prompt Pay Act, under which funds paid to a contractor are explicitly to be held in a trust for the benefit of subcontractors/suppliers as contemplated by *Sequatchie Concrete*.

38.    Specifically, under the Tennessee Prompt Pay Act, "[p]erformance by a subcontractor, materialman or furnisher in accordance with the provisions of such person's written contract with a contractor for improvement of real property shall entitle such person to payment from the contractor." Tenn. Code Ann. § 66-34-301. More importantly, the Tennessee Prompt Pay Act explicitly provides:

> Any sums received by the contractor as payment for work, services, equipment and materials supplied by the subcontractor, materialman or furnisher for improvements to real property **shall be held by the contractor in trust for the benefit and use of such subcontractor, materialman or furnisher and shall be subject to all legal and equitable remedies**.

Tenn. Code Ann. § 66-34-304 (emphasis added).   Tenn. Code Ann. § 66-34-401 further provides, "A subcontractor, materialman or furnisher contracting in writing with another subcontractor, materialman or furnisher for the improvement of real property **shall make payment to such other subcontractor, materialman or furnisher in accordance with part 3 of this chapter**." (Emphasis added).

39.     Consequently, under Tenn. Code Ann. § 66-34-304 and Tenn. Code Ann. § 66-34-401, any proceeds of the 1800 West End Subcontract PPI has or may receive as payment for labor/materials furnished by PPI's subcontractors/suppliers would be held in trust "for the benefit and use of" PPI's subcontractors/suppliers, and the equitable/beneficial interests those subcontractors/suppliers possess would not constitute property of PPI's bankruptcy estate under 11 U.S.C. § 541(d).   In other words, PPI's receipt of any proceeds of the 1800 West End Subcontract would be subject to PPI's statutory obligation to utilize those Bonded Contract Proceeds to pay PPI's subcontractors/suppliers.   Additionally, by virtue of Allied's satisfaction of their payment bond claims, Allied "is entitled to step into the shoes of" PPI's subcontractors/suppliers and assert their equitable/beneficial interest in those Bonded Contract Proceeds to the extent of Allied's payments. *Acuity v. McGhee Eng'g, Inc.*, 297 S.W.3d 718, 725 (Tenn. Ct. App. 2008).   Under either scenario, the proceeds of the 1800 West End Subcontract cannot be used as part of PPI's reorganization efforts until PPI's subcontractors/suppliers have been paid in full relative to that subcontract and Allied has been reimbursed for the payments made to PPI's subcontractors/suppliers. *See generally*, *Prairie*

*State National Bank v. United States*, 164 U.S. 227, 32 Ct. Cl. 614, 17 S. Ct. 142, 41 L. Ed. 412

(1896); *Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S. Ct. 389, 52 L.

Ed. 547 (1908); *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S. Ct. 232, 9 L. Ed. 2d

190 (1962), *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843

(1st Cir. 1969); *n re Jones Construction & Renovation, Inc.*, 337 B.R. 579, 583-84 (Bankr. E.D.

Va. 2006); *In re Larbar Corp.*, 177 F.3d 439 (6th Cir. 1999).

**The Westin Jekyll Island Subcontract and the Hyatt House Downtown Atlanta Subcontract**

40.      As explained in more detail and Paragraph 17 above, both the Westin Jekyll

Island Subcontract and the Hyatt House Downtown Atlanta Subcontract expressly dictate that (1)

PPI receives/holds all Bonded Contract Proceeds in trust for PPI's subcontractors/suppliers and

(2) Pinkerton and Evergreen have the right to pay Bonded Contract Proceeds directly to PPI's

subcontractors/suppliers.  The statutory elements for creating an express trust under Georgia law

are articulated in Ga. Code Ann. § 53-12-20(b), which provides in relevant part:

> An express trust shall have, ascertainable with reasonable certainty: (1) An
> intention by a settlor to create such trust; (2) Trust property; (3) Except for
> charitable trusts or a trust for care of an animal, a beneficiary who is reasonably
> ascertainable at the time of the creation of such trust or reasonably ascertainable
> within the period of the rule against perpetuities; (4) A trustee; and (5) Trustee
> duties specified in writing or provided by law.

Both the Westin Jekyll Island Subcontract and the Hyatt House Downtown Atlanta Subcontract

satisfy the statutory elements for creating an express trust under Georgia law because they (1)

reflect the intention of Pinkerton and Evergreen (*i.e.*, the settlors) to create an express trust, (2)

designate   the   Bonded   Contract   Proceeds   as   trust   property,   (3)   designate   PPI's

subcontractors/suppliers as trust beneficiaries, (4) designate PPI as the trustee for the Bonded

Contract Proceeds, and (5) prohibits PPI from using the Bonded Contract Proceeds for anything

other than paying PPI's subcontractors/suppliers until the purpose of the express trust has been

satisfied.   Several other courts have held that similar provisions of bonded contracts were sufficient to create an express trust under state law.  *See, e.g.*, *In re Marrs-Winn Co., Inc.*, 103 F.3d 584 (7th Cir. 1996) (subcontract); *Fed. Ins. Co. v. Fifth Third Bank*, 867 F.2d 330 (6th Cir. 1989) (bonded contract); *Westview Investments, Ltd. v. U.S. Bank Nat. Ass'n*, 138 P.3d 638 (Wash. Ct. App. 2006) (bonded contract); *Chang v. Redding Bank of Commerce*, 35 Cal. Rptr. 2d 64 (Cal. Ct. App. 1994) (bonded contract).

41.     Furthermore, Georgia law imposes a constructive trust upon payments received for labor/materials furnished by subcontractors/suppliers if those subcontractors/suppliers possess a valid lien or possess a right to file a valid lien.  *Bethlehem Steel Corp. v. Tidwell*, 66 B.R. 932, 935-941 (M.D. Ga. 1986).  Stated differently, "[t]he portion of the payments that does not exceed the amount owed to the materialman would be subject to the constructive trust fund doctrine if the payments are made to the contractor during the period of time when the materialman either enjoys the right to file a lien on the owner's property or she already has a valid lien on the owner's property."  *Id*. at 940.

42.     Therefore, any proceeds of the Westin Jekyll Island Subcontract and the Hyatt House Downtown Atlanta Subcontract that PPI has or may receive as payment for labor/materials furnished by PPI's subcontractors/suppliers would be impressed with an express and/or constructive trust in favor of PPI's subcontractors/suppliers, and the equitable/beneficial interests those subcontractors/suppliers possess would not constitute property of PPI's bankruptcy estate under 11 U.S.C. § 541(d).  PPI's receipt of any proceeds of those subcontracts would be subject to PPI's contractual and common-law obligation to utilize those Bonded Contract Proceeds to pay PPI's subcontractors/suppliers.  Moreover, by virtue of Allied's satisfaction of their payment bond claims, Allied has become statutorily subrogated to the

equitable/beneficial interests of PPI's subcontractors/suppliers relative to the Hyatt House Downtown Atlanta Subcontract under Ga. Code Ann. § 10-7-56, which states, "A surety who has paid the debt of his principal shall be subrogated, both at law and in equity, to all the rights of the creditor and, in a controversy with other creditors, shall rank in dignity the same as the creditor whose claim he paid."  Georgia law also recognizes the doctrine of equitable subrogation, which permits a surety such as Allied to stand in the shoes of the creditors it pays.  *See State Dep't of Corr. v. Developers Sur. & Indemn. Co.*, 295 Ga. 741, 745, 763 S.E.2d 868, 871 (2014).  Thus, the proceeds of the Westin Jekyll Island Subcontract cannot be used as part of PPI's reorganization efforts until PPI's subcontractors/suppliers have been paid in full relative to that subcontract.  Likewise, the proceeds of the Hyatt House Downtown Atlanta Subcontract cannot be used as part of PPI's reorganization efforts until PPI's subcontractors/suppliers have been paid in full relative to that subcontract and Allied has been reimbursed for the payments made to PPI's subcontractors/suppliers relative to that subcontract.

**The Residence Inn Orlando Subcontract**

43.    As detailed above in Paragraph 18, the Residence Inn Orlando Subcontract specifically authorizes WELBRO to withhold payment of Bonded Contract Proceeds to PPI based upon the assertion of claims/liens by PPI's subcontractors/suppliers and specifically permits WELBRO to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers.

44.    More importantly, by satisfying payment bond claims, Allied has subrogated to the rights of PPI and PPI's subcontractors/suppliers relative to the remaining proceeds of the Residence Inn Orlando Subcontract to the extent of Allied's payment.  In that regard, this Court has recognized that, "[i]n Florida, the general right of equitable subrogation is defined as 'the substitution of one person in the place of another with reference to a lawful claim or right.'"  *In*

*re Cone Constructors, Inc.*, 265 B.R. 302, 306 (Bankr. M.D. Fla. 2001). This Court has also recognized that equitable subrogation may entitle a surety to step into three different sets of shoes under Florida law as follows:

> But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, **it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety — who may have had liens**; and, not least, in the shoes of the government, for whom the job was completed.

*Id.* (citing *Transamerica Insurance Company v. Barnett Bank of Marion County, N.A.*, 540 So. 2d 113, 115–16 (Fla. 1989)). Another court has explained that "Florida law clearly provides that a surety is entitled to equitable subrogation not only to the position of subcontractors and materialmen, but also to the positions of the [debtor in possession and the [obligee]." *In re Padula Const. Co., Inc.*, 118 B.R. 143, 146 (Bankr. S.D. Fla. 1990)

45. Thus, at a minimum, by virtue of its satisfaction of payment bond claims, Allied is entitled to step into the shoes of PPI "in so far as there are receivables due [PPI]" under the Residence Inn Orlando Subcontract to the extent of Allied's payments under its payment bond. In a contest between Allied and PPI as to the superior interest in the remaining Bonded Contract Proceeds under the Residence Inn Orlando Subcontract, Allied would possess a superior right to recover at least $121,804.75 from those Bonded Contract Proceeds, which reflects the total amount of payment bond claims paid to date relative to the Residence Inn Orlando Subcontract.

**The Hyatt Place Columbia Subcontract**

46. As detailed above in Paragraph 19, Allied does not possess a copy of the Hyatt Place Columbia Subcontract between PPI and Evergreen, but Allied anticipates that the terms of that subcontract are similar to the terms of the Hyatt House Downtown Atlanta Subcontract between PPI and Evergreen, under which (1) PPI receives/holds all payments in trust for PPI's

subcontractors/suppliers and (2) Evergreen has the right to pay Bonded Contract Proceeds directly to PPI's subcontractors/suppliers.  The statutory elements for creating an express trust under South Carolina law are articulated in S.C. Code Ann. § 62-7-402(a), which provides, in relevant part:

> A trust is created only if: (1) the settlor has capacity to create a trust; (2) the settlor indicates an intention to create the trust; (3) the trust has a definite beneficiary . . .  (4) the trustee has duties to perform; and (5) the same person is not the sole trustee and sole current and future beneficiary.

S.C. Code Ann. § 62-7-402(c) further clarifies that "[a] beneficiary is definite if the beneficiary can be ascertained now or in the future, subject to any applicable rule against perpetuities." Accordingly, assuming that the terms of the Hyatt Place Columbia Subcontract are similar to the terms of the Hyatt House Downtown Atlanta Subcontract, the Hyatt Place Columbia Subcontract would satisfy the statutory elements for creating an express trust under South Carolina law because it would (1) reflect the intention of Evergreen (*i.e.*, the settlor) to create an express trust, (2) designate the Bonded Contract Proceeds as trust property, (3) designate PPI's subcontractors/suppliers as trust beneficiaries, (4) designate PPI as the trustee for the Bonded Contract Proceeds, and (5) prohibit PPI from using the Bonded Contract Proceeds for anything other than paying PPI's subcontractors/suppliers until the purpose of the express trust has been satisfied.

47.     The Hyatt Place Columbia Subcontract is also subject to S.C. Code Ann. § 29-7-10, which provides in pertinent part:

> Any . . . subcontractor in the erection, alteration, or repairing of buildings in this State **shall pay all laborers, subcontractors, and materialmen for their lawful services and material furnished <u>out of the money received</u> for the erection, alteration, or repairs of buildings upon which such laborers, subcontractors, and materialmen are employed or interested and such laborers, as well as all subcontractors and persons who shall furnish material for any such building, <u>shall have a first lien on the money received by such contractor</u> for the**

**erection, alteration, or repair of such building in proportion to the amount of their respective claims**.

Consequently, PPI is statutorily obligated to pay its subcontractors/suppliers "out of the money received" from Evergreen under the Hyatt Place Columbia Subcontract, which precludes PPI from using those Bonded Contract Proceeds for its reorganization efforts until PPI's subcontractors/suppliers are paid in full.   Additionally, under South Carolina law, "if a surety pays the debt of his principal, he is subrogated to the benefit of all securities, funds, liens, and equities which the creditor has against the principal." *Brown Const. Co. v. Massachusetts Bonding & Ins. Co.*, 176 S.C. 76, 179 S.E. 697, 702 (1935).   Thus, Allied is entitled to recover at least $121,096.40 from the remaining proceeds of the Hyatt Place Columbia Subcontract, which equals the total amount of payments Allied has made to PPI's subcontractors/suppliers under its payment bond.

## CONCLUSION

For the foregoing reasons, Allied has not violated the automatic stay by refusing PPI's demand that Allied "retract" its pre-petition letters of direction, and the Motion to Compel should be denied.   Moreover, as detailed herein, the pre-petition letters of direction are not having the disastrous post-petition effects of which PPI complains because, at most, PPI possesses bare legal title to the remaining Bonded Contract Proceeds in the hands of the general contractors, and PPI cannot use those Bonded Contract Proceeds to "cash flow" its reorganization efforts until all of PPI's subcontractors/suppliers have been paid under each of the Bonded Contracts and Allied has been reimbursed for the payment bond claims it has paid in relation to each of the Bonded Contracts.

Dated: September 8, 2015

Respectfully submitted,

*/s/Jarrod W. Stone*
Jarrod W. Stone
Tennessee Bar No.: 023915
*Admitted Pro Hac Vice*
Manier & Herod
One Nashville Place
Suite 2200
150 Fourth Avenue North
Nashville, TN 37219-2494
(615) 742-9314
(615) 242-4203 – fax
jstone@manierherod.com

*/s/Jonathan P. Cohen*
Jonathan P. Cohen
Florida Bar No.: 11526
**Jonathan P. Cohen, P.A.**
500 E. Broward Blvd.
Suite 1710
Fort Lauderdale, FL 33394
(954) 462-8850
(954) 848-2987 -fax
jcohen@jcohenpa.com
service@jcohenpa.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 8, 2015, I electronically filed the foregoing using CM/ECF and by U.S. Mail to the entities or individuals listed on the mailing matrix who are not eligible to receive copies electronically.

*/s/ Jonathan P. Cohen*
Jonathan P. Cohen

Label Matrix for local noticing
113A-6
Case 6:15-bk-07275-KSJ
Middle District of Florida
Orlando
Fri Sep  4 07:57:29 EDT 2015

First Green Bank
18251 US Highway 441
Mount Dora, Fl 32757-6718

Progressive Plumbing, Inc.
1064 W Highway 50
Clermont, FL 34711-2835

Allied World Specialty Ins Co f/k/a Darwin N
C/O Jonathan P. Cohen, Esq.
500 E. Broward Blvd. Suite 1710
Fort Lauderdale, FL 33394-3012

Canon Financial Services
158 Gaither Drive
Mount Laurel, NJ 08054-1716

Darwin National Assurance Co
1690 New Britian Ave
Suite 101
Farmington, CT 06032-3361

Ferguson Enterprises Inc
12500 Jefferson Ave
Newport News, VA 23602-4314

First Green Bank
18251 US Hwy 441
Mount Dora, FL 32757-6718

First Green Bank
c/o Mark F. Ahlers, Esq.
Fishback Dominick
1947 Lee Road
Winter Park, FL 32789-1834

Florida Department of Revenue
Bankruptcy Unit
Post Office Box 6668
Tallahassee FL 32314-6668

Ford Motor Credit
Tax Dept, WHQ Room 612
One American Road
Dearborn, MI 48126-2701

Hughes Supply Inc
One Hughes Way
Orlando, FL 32805

Internal Revenue Service
Centralized Insolvency
PO Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
Post Office Box 7346
Philadelphia PA 19101-7346

Lake County Tax Collector
Attn:  Bob McKee
Post Office Box 327
Tavares FL 32778-0327

Marlin Business Bank
2795 E Cottonwood Pkwy
#120
Salt Lake City, UT 84121-7092

Nissan Motor Acceptance
Corporation
PO Box 650214
Attn: Katherine Melendrez
Dallas, TX 75265-0214

Nissan Motor Acceptance
POB 660366
Dallas, TX  75266-0366

Timothy Laffredi, Trial Attorney
US Dept. of Justice
George C. Young Federal Bldg.
400 W. Washington St., Suite 1100
Orlando  FL 32801-2210

Mark F Ahlers +
Fishback Law Firm
1947 Lee Road
Winter Park, FL 32789-1834

United States Trustee - ORL +
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801-2210

Timothy S Laffredi +
Office of the United States Trustee
400 W. Washington St., Suite 1100
Orlando, FL 32801-2440

Michael A Nardella +
Nardella & Nardella, PLLC
250 East Colonial Drive, Ste 102
Orlando, FL 32801-1231

Roman V Hammes +
Roman V. Hammes, P.L
250 East Colonial Drive, Suite 305
Orlando, FL 32801-1231

Jonathan P Cohen +
Jonathan P. Cohen, P.A.
500 East Broward Blvd., Suite 1710
Fort Lauderdale, FL 33394-3012

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Allied World Specialty Insurance Company

End of Label Matrix
Mailable recipients    24
Bypassed recipients     1
Total                  25