ORDERED.

Dated:  September 20, 2016

_____
Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re ) | |
| ) | |
| PROGRESSIVE PLUMBING, INC., ) | Case No. 6:15-bk-07275-KSJ |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

## MEMORANDUM OPINION GRANTING MOTION FOR RELIEF FROM STAY

Allied World Specialty Insurance Company ("Allied") provided surety bonds to insure performance and payment for commercial plumbing jobs undertaken by the Debtor, Progressive Plumbing, Inc. ("Progressive"). Two of the bonded projects involved the same general contractor, The Evergreen Construction Corporation.[1] One project was located in Atlanta and, due to Progressive's inability to complete the job, Allied paid others to finish the job. Debtor eventually completed the second project in South Carolina, and now is due approximately $70,000.[2] Allied filed its motion seeking stay relief[3] to collect this balance due arguing legal theories of subrogation and setoff. The Court holds Allied is entitled to relief from stay to pursue the funds.

---

[1] Doc. No. 279, ¶ 2.
[2] Allied however did pay approximately $121,000 to others to assist Progressive in eventually completing the South Carolina work. Doc. No. 278, ¶¶8-9; Doc. No. 279, ¶5.
[3] Doc. No. 278. Debtor filed a Response. Doc. No. 317. Allied filed a Reply. Doc. No. 343. Debtor then filed a Surreply. Doc. No. 357.

1

Progressive and Allied entered into a General Indemnity Agreement ("GIA") where Allied agreed to stand as surety for certain jobs Progressive performed.[4] Progressive assigned, transferred, pledged, and conveyed certain collateral to Allied to secure the obligations under the GIA.[5] Among other things, this included all contracts referred to in the bonds; all sums that may be due or become due on any of the contracts referred to in the bonds (including all percentages retained); all rights, title, and interest in any subcontracts; and all of the proceeds of these contracts.[6] The GIA permitted Allied to enforce its security interests[7] if Progressive defaulted by failing to complete a job covered by the bond.[8] The GIA also provided that it was "expressly understood" that any rights that Allied may have against Progressive under any "such other or additional agreements of indemnity or collateral will be in addition to, and not in lieu of, the rights afforded to [Allied] under this [a]greement."[9]

Progressive agrees that it defaulted on at least one of the nine projects bonded (the "Bonded Projects") by Allied—the Hyatt Atlanta.[10] Both parties acknowledge, however, that Allied made payments on several of the Bonded Projects.[11] In March 2015, Allied demanded $750,000 in collateral from Progressive for its then estimated losses on the Bonded Projects.[12] Progressive could not make a $750,000 payment, so it executed a promissory note (the "Note") in favor of Allied and payable over time for approximately $752,000.[13] To secure the Note, Progressive and its principals executed a mortgage and security agreement giving Allied a mortgage on Progressive's headquarters and other property owned by non-debtor entities (the

---

[4] Doc. No. 54, Exh. 1; Doc. No. 278, Exh. A. The GIA was executed on March 20th, 2013.
[5] *Id.* at § 5.1, on p. 7.
[6] *Id.*
[7] *Id.* at § 5.2, on p. 8.
[8] *Id.*
[9] *Id.* at § 7.10, on p. 11.
[10] Doc. No. 54, ¶ 6.
[11] Doc. No. 54, ¶¶ 5-7.
[12] Doc. No. 54, Exh. 2.
[13] Doc. No. 54, ¶ 10; Doc. No. 54. Exh. 4. The note is governed by Florida law.

2

"Allied Mortgage").[14] In August 2015, Allied then requested an additional $750,000 in collateral for additional losses expected on the Bonded Projects.[15] Progressive did not meet this second demand.

Allied then sent letters to the general contractors on the Bonded Projects asking them to pay all amounts due Progressive directly to Allied.[16] Progressive in response filed this bankruptcy case[17] and an emergency Motion to Compel Compliance with the Automatic Stay.[18] The Court granted Progressive's motion and found that the collection letters violated the automatic stay and either had to be retracted or they were void and without effect.[19] Progressive got a break in Allied's collection efforts to stabilize its business.

Allied and Progressive admirably worked together during this Chapter 11 case to finish the Bonded Projects and to find a solution to the parties' dispute. Due to their cooperative dialogue, Progressive's Chapter 11 Plan[20] was confirmed on June 10, 2016.[21] Allied is due approximately $1 million for amounts it expended to finish the Bonded Projects.[22] Under the confirmed Plan, Progressive will pay Allied $250,000 and reaffirm the $752,000 Note.[23] The only remaining issue is whether Progressive or Allied should receive the $70,000 payable on the completion of the South Carolina project, which is what Allied seeks in this motion for relief from the stay. The Plan contemplates that if the monies are paid directly to Allied, Allied will apply a credit the $70,000 payment to the Note.[24] So, the issue really is one of timing: Should Allied get this $70,000 now under theories of subordination or setoff or, instead, can the Debtor

---

[14] Claims Register, Claim No. 32, Exh. E.
[15] Doc. No. 54, Exh. 5.
[16] Doc. 54, Composite Exh. 6.
[17] Doc. No. 1. The petition was filed on August 24, 2015.
[18] Doc. No. 22.
[19] Doc. No. 86; Doc. No. 98.
[20] Doc. No. 302.
[21] Doc. No. 320; Doc. No. 360.
[22] Doc. No. 278, ¶¶ 12-13.
[23] Doc. Nos. 276, 319. Doc. No. 302, on pp. 22-24.
[24] Doc. No. 276, ¶ 13(f).

3

use the monies to fund current operations in light of the compromise between the parties in the confirmed Plan and pay Allied over time?

Allied argues causes exists for the Court to grant relief from the automatic stay because the $70,000 is not property of the estate under the doctrine of equitable subrogation. Progressive disagrees primarily arguing Allied has no right to equitable subrogation because all amounts due on the Bonded Projects were rolled into the Note, which constituted a novation or waiver precluding subordination. The Court holds Allied is entitled to the $70,000 and stay relief to pursue collection of the monies.

## **Equitable Subrogation**

Equitable subrogation arises when a subcontractor or contractor defaults on obligations under its contract and the surety steps in to either complete the work or pay bills on the project.[25] A surety has a right to the balance due to the contractor to the extent of full reimbursement.[26] As Judge Glenn stated in *In re Cone Constructors, Inc.*,[27] "[i]t is well recognized that a surety who has been compelled to pay the debts of its principal possesses a right of equitable subrogation."[28]

Most cases involving equitable subrogation in the suretyship context cite the United States Supreme Court case *Pearlman v. Reliance Ins. Co.*,[29] for the following general propositions:

> Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise such as the surety here had. And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule [is] widely applied in this country and [is] generally known as the right of subrogation.[30]

---

[25] *Kentucky Central Ins. Co. v. Brown (In re Larbar Corp.)*, 177 F.3d 439, 443-44 (6th Cir. 1999).
[26] *Id.* (citing *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); *Prairie State Bank v. United States*, 164 U.S. 227, 240, 17 S.Ct. 142, 41 L.Ed. 412 (1896)).
[27] 265 B.R. 302 (Bankr. M.D. Fla. 2001). This case was in the context of a contract between the Florida Department of Transportation and a private general contractor. Florida law requires those who work on government contracts to obtain performance and payment bonds on the project. Fla. Stat. § 255.05 (2012).
[28] *Id.* at 306.
[29] 371 U.S. 132, 83 S. Ct. 232, 9 L. Ed. 2d 190 (1962).
[30] *Id.* at 136–37.

While some modern courts have questioned the applicability of *Pearlman* post-bankruptcy code,[31] the Fourth Circuit noted that the Supreme Court cited *Pearlman* since the enactment of the Bankruptcy Code and did not question its validity.[32]

State law governs the application of subrogation principles.[33] Because of the different choice of law provisions contained in the GIA (New York), the Note (Florida), and perhaps the contract itself (South Carolina),[34] the Court is not easily able to determine which state's law to apply. Fortunately, all three states have similar rules for subrogation.

South Carolina law provides equitable subrogation is applicable and appropriate when: "(1) the party claiming subrogation has paid the debt; (2) the party was not a volunteer but had a direct interest in the discharge of the debt or lien; (3) the party was secondarily liable for the debt or for the discharge of the lien; and (4) no injustice will be done to the other party by the allowance of the equity."[35] Under Florida law, the elements of subrogation are: (1) subrogee made the payment to protect its interests; (2) subrogee was not a volunteer; (3) subrogee was not primarily liable for the debt; (4) subrogee paid debt in full; (4) subrogation would not prejudice any third party.[36] Under New York law, "the equitable doctrine of subrogation is applicable to cases where a party is compelled to pay the debt of a third person to protect his own rights, or to save his own property."[37] New York law provides that the principles of equitable subrogation

---

[31] *In re Glenbrook Group, Inc.*, 552 B.R. 735 (Bankr. N.D. Ill. 2016) ("In fact, the very things the Court states are not property of the estate in Pearlman, property subject to equitable interests, mortgages, liens, etc., are now included as property of the estate under § 541(d), albeit subject to any equitable interest.").
[32] *Grochal v. Ocean Technical Services Corp. (In re Baltimore Marine Indus.)*, 476 F.3d 238, 241 n. 4 (4th Cir. 2007) (citing *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 264, 119 S. Ct. 687, 142 L.Ed.2d 718 (1999)).
[33] *The Celotex Corp. v. Allstate Ins. Co. (In re Celotex Corp.)*, 289 B.R. 460, 468 (Bankr. M.D. Fla. 2003).
[34] The subcontract does not include a choice of law provision but references the "Contract" between the owner and the general contractor, which may have a choice of law provision.
[35] *In re Houston*, 409 B.R. 799, 808–09 (Bankr. D.S.C. 2009) (citing *United Carolina Bank v. Caroprop, Ltd.*, 446 S.E.2d 415, 416 (1994))
[36] *Dade Country School Bd. V. Radio Station WQBA*, 731 So. 2d 638, 646 (Fla. 1999).
[37] *Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 726 F. Supp. 2d 339, 352–53 (S.D.N.Y. 2010) (quoting *Broadway Houston Mack Dev., LLC v. Kohl*, 71 A.D.3d 937, 937–938 (2d Dep't 2010)) (internal quotation marks omitted). *See also Gen. Ins. Co. of Am. v. Mezzacappa Bros.*, 110 F. App'x 183, 184 (2d

should be liberally applied to protect those parties who are its natural beneficiaries.[38] Under any of these rules, Allied is entitled to subrogation and receipt of the $70,000.

Allied paid approximately $121,000 on the South Carolina project.[39] Allied was obligated, pursuant to the GIA, to pay these subcontractors. Had Allied not paid those subcontractors, Evergreen would have had to pay them, perhaps resulting in no funds available for distribution.[40] Allied was not primarily liable for this debt but paid on account of the GIA. Allied paid the two subcontractors in full. Allied was not a volunteer. Further, no injustice will be done to any third parties by allowing Allied the opportunity to pursue these funds. Allied is entitled to relief from stay to collect the $70,000 from the South Carolina project.

## Novation or Waiver

Progressive argues that Allied either has waived this subrogation right by the terms of the confirmed Plan or, alternatively, that the $752,000 Note constituted a novation precluding subrogation. The Court disagrees finding no waiver by Allied and no novation.

Progressive argues that the Note acted as a novation so that Allied's subrogation rights under the GIA are now not available.[41] The Eleventh Circuit Court of Appeals lists the four elements to effectuate novation of a binding contract under Florida law: "(1) a previously valid contract; (2) agreement of the parties to cancel the contract; (3) a new valid and binding contract; (4) agreement of the parties that the new contract will replace and extinguish the old one."[42] The Court may infer intent from the totality of the circumstances.[43] When the terms and conditions of

---

Cir. 2004) ("Under New York law a surety's rights in the property of its insured are secured by virtue of equitable subrogation.").
[38] *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 379 (E.D.N.Y. 2000).
[39] Doc. No. 280, ¶ 16.
[40] *Id.*
[41] Indeed, Progressive concedes that Allied may have exercised its right to equitable subrogation before the execution of the promissory note. Doc. No. 357, P. 4 ("Prior to accepting the Note, Allied could very well have exercised its right to equitable subrogation of any proceeds on [the South Carolina Job]").
[42] *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1237 (11th Cir. 2008) (citations omitted).
[43] *Id.*

the new written agreement are not in doubt, the question of whether that new agreement effects a novation is one of law.[44] Progressive has failed to establish each of these four traits.

The previously valid contract is the GIA. The new contract is the Note. True, the Note has specific payment terms.[45] However, it is not clear that there was an agreement of the parties to cancel the GIA or an agreement that the Note would replace and extinguish the rights and remedies under the GIA. In fact, the demand letters Allied sent to the general contractors on the Bonded Projects when this bankruptcy case was filed would posit an exact opposite intent—that Allied intended the Note and the GIA to remain simultaneously valid. This conclusion is bolstered by the fact, known in hindsight, that Allied's losses exceed the amount of the $752,000 Note.

Allied always preserved its right to demand more money as its losses accrued or its reserves increased.[46] The Note references the GIA only once—"The Note is further secured by the [GIA] dated March 20, 2013."[47] The Note also provides that the remedies of Allied in the Note or the other "Loan Documents shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of [Allied.]"[48] The "Loan Documents" are defined as the Note, the Mortgages, the Security Agreements, and all other documents and instruments executed in connection with the Note.[49] The Court finds that one of the Security Agreements, and therefore one of the Loan Documents, is the GIA. All remedies stemming from the relationship created by the GIA are cumulative with the remedies under the Note. The Note does not mention equitable subrogation—the Court will not infer and extinguish Allied's equitable

---

[44] *Id.*
[45] Doc. No. 54, Exh. 4, on p. 3.
[46] Doc. No. 54, Exhs. 2 and 5. The letters state "[n]othing herein shall be deemed to be an estoppel, waiver or modification of any of Allied World's rights or defenses and Surety hereby reserves all of its rights and defenses under any Agreement of Indemnity, contracts, agreements, bonds, or applicable law. Allied World reserves the right under the Agreement of Indemnity to make further demands on you for money as its losses accrue or its reserves are increased."
[47] Doc. No. 54, Exh. 4, on p. 3.
[48] Doc. No. 54, Exh. 4, on p. 3.

7

subrogation rights absent an express indication that was what the parties intended.[50] No novation occurred.

Nor did Allied waive its subrogation rights. The Supreme Court of Florida generally defines waiver as an intentional voluntary relinquishment of a known right or conduct that implies intentional voluntary relinquishment of a known right.[51] The Court may consider the totality of the circumstances.[52] Here, considering the language contained in the GIA, the Note, the demand letters, and the conduct of the parties, the Court holds that Allied did not waive its equitable subrogation rights by accepting the Note.

### Conclusion

Allied is entitled to relief from stay to pursue the funds due under the South Carolina project under the doctrine of equitable subrogation. The Note did not act as a novation, and Allied did not waive its equitable subrogation rights. A consistent order will be entered simultaneously with this memorandum opinion.

###

Attorney, Jonathan Cohen, is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of the entry of this order.

---

[49] Doc. No. 54, Exh. 4, on p 3.
[50] *In re Larbar Corp.*, 177 F.3d at 445.
[51] *Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So. 2d 707, 711 (Fla. 2005).
[52] *Green Tree Servicing, LLC v. McLeod*, 15 So. 3d 682, 687 (Fla. 2d Dist. Ct. App. 2009) ("Thus, the question of whether there has been waiver in the arbitration agreement context should be analyzed in much the same way as in any other contractual context. The essential question is whether, under the totality of the circumstances, the defaulting party has acted inconsistently with the arbitration right.") (internal quotation marks and citations omitted).